Filed 3/15/18

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| DON'T CELL OUR PARKS,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>CITY OF SAN DIEGO,<br><br>    Defendant and Respondent;<br><br>VERIZON WIRELESS,<br><br>    Real Party in Interest and Respondent. | D071863<br><br>(Super. Ct. No. 37-2015-00026359-<br> CU-TT-CTL) |

APPEAL from a judgment of the Superior Court of San Diego County, Judith F. Hayes, Judge. Affirmed.

Law Office of Craig A. Sherman and Craig A. Sherman for Plaintiff and Appellant.

Jan I. Goldsmith and Mara W. Elliott, City Attorneys, and Glenn T. Spitzer, Deputy City Attorney, for Defendant and Respondent City of San Diego.

Gatzke Dillon & Balance and Kevin P. Sullivan for Real Party in Interest and Respondent Verizon Wireless.

San Diego City Charter section 55 (Charter 55) provides that real property formally dedicated in perpetuity "for park, recreation or cemetery purposes shall not be used for any but park, recreation or cemetery purposes without such changed use or purpose having been first authorized or later ratified by a vote of two-thirds of the qualified electors of the City [of San Diego] voting at an election for such purpose."

Verizon Wireless (Verizon) obtained approval from the City of San Diego (the City, together respondents) to construct a wireless telecommunications facility (WCF, the Project) in Ridgewood Neighborhood Park (the Park), a dedicated park. Don't Cell Our Parks (DCOP), a not-for-profit entity, filed a petition for writ of mandate challenging the City's determination. The trial court denied the petition, concluding that under Charter 55 the City had control and management of dedicated parks and the discretion to determine whether a particular park use would change the use or purpose of the Park and thus require a public vote. We conclude that the Project does not constitute a changed use or purpose that required voter approval. DCOP also asserts that the Project does not qualify under the California Environmental Quality Act (CEQA; Pub. Resources Code, § 21000 et seq.) for a categorical exemption under CEQA Guidelines section 15303[1] which pertains to the construction of new small facilities. We reject this argument. Accordingly, we affirm the judgment.

---

[1]     All references to the "Guidelines" are to title 14 of the California Code of Regulations section 15000 et seq.

2

FACTUAL AND PROCEDURAL BACKGROUND

In 2000 the City adopted San Diego Ordinance No. 18771 (Ordinance No. 18771) which dedicated the Park in perpetuity for park and recreational purposes in accordance with Charter 55 and City Council Policy 700-17. Ordinance No. 18771 states that under Charter 55 the Park "shall not be used for any but park and recreation purposes without a changed use or purpose being authorized by a two-thirds vote of the people." Ordinance No. 18771 provided an exception whereby the City "reserve[d] the right to establish underground public service easements through and across [the Park] so long as the construction and maintenance of the subject easements [did] not substantially negatively impact the availability of the property for use for park and recreational purposes."

The Park is located in a residential zone in the community of Rancho Peñasquitos and adjacent to the Los Peñasquitos Canyon Preserve (the Preserve) to the south. In June 2014 Verizon filed an application with the City to build a WCF on the outskirts of the Park. The Project consists of a 35-foot-tall mono-eucalyptus and a 220-square-foot equipment enclosure with a trellis roof and a chain link lid.

A Verizon engineer explained that deficiencies exist in its wireless services in the area around the Park, including frequent connection drops and unreliable network access. Additionally, these poor coverage conditions "use up more time and spectrum resources in order to try and deliver the user content reliably. This uses up the limited physical resources quickly and can deprive other users connected to the site from gaining access to those resources impacting user experience for all customers in the area." Color maps

3

show that wireless communication coverage in the Park and surrounding areas is poor, but would be excellent after installation of the Project.

Before identifying the Park as the proposed Project site, Verizon provided a search ring outlining the area where a WCF needed to be located to meet coverage objectives. Verizon explained that the surrounding topography and limited locations to place a WCF made the area difficult to serve. Verizon concluded that properties located outside the search ring were not feasible and that the Park was the only property within the intended coverage area that was not an open space preserve or developed with single family residences. Additionally, under City location guidelines, the Park was a preferred location over surrounding properties. The Verizon engineer concluded that "[n]eighboring sites and projects [could not] provide adequate coverage due to terrain challenges in the area."

In February 2015[2] the Rancho Peñasquitos Community Planning Board voted 11-7 to approve the Project. In April the City determined that the Project on the periphery of the developed Park qualified for an exemption from CEQA. DCOP appealed the CEQA exemption determination. In June, after a public hearing, the city council denied DCOP's appeal, unanimously determining that the Project was exempt from environmental review under CEQA. In August a City hearing officer, after a public hearing, approved development and use permits for the Project. DCOP appealed the hearing officer's

_____

[2] All further unspecified date references are to 2015.

decision and initiated this action. In October the City Planning Commission (Commission), after public hearing, unanimously approved the permits.

In November DCOP filed its operative first amended complaint requesting declaratory and injunctive relief, and a writ of mandamus. DCOP argued that placing a WCF in the Park was not a permissible park or recreational use under the plain language of Charter 55. DCOP sought to overturn a hearing officer's decision approving the development and use permits for the Project. DCOP also asserted that the Project did not qualify under CEQA for a categorical exemption under Guidelines section 15303 which pertains to the construction of new small facilities. Accordingly, DCOP also sought to overturn the City's resolution determining that the Project was exempt from CEQA.

The parties agreed that all claims were primarily legal and would be tried on the papers based on the administrative record. The court subsequently issued a tentative ruling in favor of respondents. After hearing argument, the court took the matter under submission and later issued a minute order and written decision in favor of respondents. After input from the parties, the court issued a final statement of decision.

In its statement of decision, the trial court stated that the Project entailed placing an unmanned cell tower disguised as a 35-foot-high faux eucalyptus tree and a 250-square-foot landscaped equipment structure on the outskirts of the 8.53 acre Park. The faux tree would be installed in an existing stand of tall trees, two of which are about 55 feet high. The court noted that the administrative record contained evidence showing that the Project would fill a substantial gap in Verizon's cell service so that area customers will have improved cell service capabilities and 911 service, including within the Park

5

and the nearby Preserve area, and that no feasible alternative locations for the Project existed. The City submitted evidence that it currently has 37 active leases for telecommunications facilities in dedicated parks within the City. After declining to reach the issue whether DCOP exhausted its administrative remedies, the trial court concluded that the Project would not cause significant environmental effects and that no unusual circumstances established an exception to the CEQA exemption.

DCOP timely appealed from the judgment in favor of respondents. While this appeal was pending, we sent a letter to counsel asking the City to provide any materials relevant to ascertaining the intent of the voters when enacting Charter 55 in 1931, and all subsequent amendments thereto. We also asked the parties to assume that we reject the interpretation of Charter 55 tendered by respondents and overturn approval of the Project. Based on this assumption the parties were requested to submit supplemental letter briefs addressing what impact, if any, this decision had on (1) similar projects that have been constructed after obtaining City approval and (2) DCOP's CEQA arguments. We received and considered those submissions.[3]

---

[3] DCOP objected to the City's supplemental brief noting that many of the WCF structures mentioned in the brief are not similar to the Project, that the brief contains speculative arguments, and arguments about structures that are not related to telecommunications. DCOP also objected to five exhibits attached to the City's supplemental letter brief as not authenticated and incomplete. DCOP's objection to exhibit No.'s 1-5 attached to the City's supplemental letter brief is sustained.

DISCUSSION

## I. *CHARTER 55 DOES NOT PROHIBIT CONSTRUCTION OF THE PROJECT WITHIN THE PARK*

A. *Charter 55*

The current version of Charter 55, entitled "Park and Recreation," provides in relevant part:

> "The City Manager[4] *shall have the control and management of parks*, parkways, plazas, beaches, cemeteries, street trees, landscaping of City-owned property, golf courses, playgrounds, recreation centers, recreation camps and recreation activities held on any City playgrounds, parks, beaches and piers, which may be owned, controlled or operated by the City. *The City Council shall by ordinance adopt regulations for the proper use and protection of said park property*, cemeteries, playgrounds and recreation facilities, and provide penalties for violations thereof. The Manager is charged with the enforcement of such regulations.
>
> "All real property owned in fee by the City heretofore or hereafter formally dedicated in perpetuity by ordinance of the Council or by statute of the State Legislature for park, recreation or cemetery purposes *shall not be used for any but park, recreation or cemetery purposes without such changed use or purpose* having been first authorized or later ratified by a vote of two-thirds of the qualified electors of the City voting at an election for such purpose. **However, real property which has been heretofore or which may hereafter be set aside without the formality of an ordinance or statute dedicating such lands for park, recreation or cemetery purposes may be used for any public purpose deemed necessary by the Council.**

---

4      In 2004 the citizens of San Diego added article XV to the Charter, adopting a strong mayor form of governance. (San Diego City Charter, art. XV, § 250.) Article XV transferred all executive authority, power and responsibilities conferred upon the city manager to the mayor. (*Id.* at § 260.) We take judicial notice of San Diego City Charter article XV, attached to the respondents' brief at exhibit A. (Evid. Code, § 451, subd. (a); Cal. Rules of Court, rule 8.204(d).)

"Whenever the City Manager recommends it, and the City Council finds that the public interest demands it, the City Council may, without a vote of the people, authorize the opening and maintenance of streets and highways over, through and across City fee-owned land which has heretofore or hereafter been formally dedicated in perpetuity by ordinance or statute for park, recreation and cemetery purposes." (Italics & boldface added.)

The voters enacted Charter 55 in April 1931 and it has been amended four times until enactment of the current version in December 1975. When enacted, and through each subsequent amendment, the italicized language *ante* has not materially changed. In 1953 the voters amended Charter 55 to add the bolded language *ante* and the paragraph pertaining to streets and highways through dedicated parks.

B. *Statement of Decision and the Parties' Contentions*

DCOP requested a declaratory judgment and injunctive relief that San Diego Municipal Code (SDMC) section 141.0420, subdivisions (d)(4) and (i) are void because they impermissibly conflict with Charter 55 by allowing the installation of WCF's in dedicated City parkland without the consent of two-thirds of the voters as required by Charter 55. The trial court denied DCOP's requests, concluding that Charter 55 allowed the City to adopt regulations to manage City parks and enact ordinances not in conflict with Charter 55, such as the instant Project. In reaching this conclusion, the court determined that the express terms of Charter 55 gave the city manager and city council control and management of City parks, including adopting regulations for the use and protection of park property.

The court concluded that the Project would not interfere with or detract from park uses in the Park and was consistent with Charter 55. In reaching this conclusion, the

8

court noted a "significant history of legal opinions and policies" applying the City's interpretation of Charter 55 in allowing WCF's in dedicated parks as long as the WCF did not detract from park uses or interfere with park purposes. The court gave "great weight and respect to the City's interpretation" of Charter 55, noting that the City's interpretation had not been challenged for many years and many transactions occurred in reliance on the City's interpretation.

DCOP contends the trial court erred because Charter 55 unambiguously restricts the use of dedicated parks to only park, recreation, and cemetery uses. DCOP argues that the trial court erred by accepting the City's interpretation and policies that conflict with the unambiguous and plain language use restrictions of Charter 55. DCOP asserts the court also erred by failing to determine the intent of the voters who enacted Charter 55 in 1931 and by relying on the City's management authority set forth in the first paragraph of Charter 55 without addressing the use restrictions in the second paragraph of Charter 55. Assuming arguendo that statutory construction is necessary to reconcile or harmonize conflicting provisions of Charter 55, DCOP asserts any interpretation should not obviate specific and express provisions restricting land use in dedicated parks.

We start with general legal principles governing our review. We then interpret Charter 55.

C. *General Legal Principles*

The charter is "the supreme law of the City, subject only to conflicting provisions in the federal and state Constitutions and to preemptive state law. [Citation.] In this regard, '[t]he charter operates not as a grant of power, but as an instrument of limitation

9

and restriction on the exercise of power over all municipal affairs which the city is assumed to possess; and the enumeration of powers does not constitute an exclusion or limitation.' " (*Domar Electric, Inc. v. City of Los Angeles* (1994) 9 Cal.4th 161, 170 (*Domar*).)  By adopting a charter, the City accepted the privilege of autonomous rule and " 'has all powers over municipal affairs, otherwise lawfully exercised, subject only to the clear and explicit limitations and restrictions contained in the charter.'  [Citations.] Charter provisions are construed in favor of the exercise of the power over municipal affairs and 'against the existence of any limitation or restriction thereon which is not expressly stated in the charter . . . .'  [Citations.]  Thus, '[r]estrictions on a charter[ed] city's power may not be implied.' "  (*Id.* at p. 171.)

The principles of construction that apply to statutes also apply to the interpretation of charter provisions.  (*Arntz v. Superior Court* (2010) 187 Cal.App.4th 1082, 1092, fn. 5.)  "In construing a provision adopted by the voters our task is to ascertain the intent of the voters."  (*International Federation of Professional & Technical Engineers v. City and County of San Francisco* (1999) 76 Cal.App.4th 213, 224 (*International Federation*).) "We look first to the language of the charter, giving effect to its plain meaning. [Citation.]  Where the words of the charter are clear, we may not add to or alter them to accomplish a purpose that does not appear on the face of the charter or from its legislative history."  (*Domar*, *supra*, 9 Cal.4th at p. 172.)  " 'An interpretation that renders related provisions nugatory must be avoided . . .[], [and] each sentence must be read . . . in the light of the [charter's overall] scheme . . . .' "  (*International Federation*, at p. 225.) "When statutory language is susceptible of more than one reasonable interpretation,

courts should consider a variety of extrinsic aids, including the ostensible objects to be achieved, the evils to be remedied, the legislative history including ballot pamphlets, public policy, contemporaneous administrative construction and the overall statutory scheme." (*Ibid.*)

A "charter city may not act in conflict with its charter" (*Domar, supra,* 9 Cal.4th at p. 171) and "[a]ny act that is violative of or not in compliance with the charter is void." (*Ibid.*) Construing a city charter is a legal issue we review de novo. (*United Assn. of Journeymen v. City and County of San Francisco* (1995) 32 Cal.App.4th 751, 759, fn. 6.) Nonetheless, "[a]dministrative interpretations [of City Charter provisions] of longstanding are entitled to great weight unless they are plainly wrong." (*Baird v. City of Los Angeles* (1975) 54 Cal.App.3d 120, 123.) In reviewing an agency's interpretation of law we exercise our " '*independent judgment . . .* , giving *deference* to the determination of the agency *appropriate* to the circumstances of the agency action.' " (*Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 8 (*Yamaha*); see *Stolman v. City of Los Angeles* (2003) 114 Cal.App.4th 916, 928 [applying *Yamaha* in reviewing zoning administrator's interpretation of city charter and municipal code].) "[E]vidence that the agency 'has consistently maintained the interpretation in question, especially if [it] is long-standing' [citation], and indications that the agency's interpretation was contemporaneous with legislative enactment of the statute being interpreted,' " warrant increased deference. (*Yamaha*, at p. 13.) Finally, " " "we apply the substantial evidence test to the trial court's factual findings." ' " (*Fry v. City of Los Angeles* (2016) 245 Cal.App.4th 539, 549.)

11

D.  *Interpreting Charter 55*

The parties differ as to the degree of deference, if any, owed to the City's interpretation of Charter 55.  As we shall discuss, the intent of the voters can be ascertained from the plain language of Charter 55, rendering it unnecessary for us to consider extrinsic aids or the City's interpretation.  (*International Federation*, *supra*, 76 Cal.App.4th at p. 225.)[5]  We start our analysis with the language of Charter 55, giving effect to its plain meaning.  (*Domar*, *supra*, 9 Cal.4th at pp. 171-172.)  The meaning of Charter 55 "may not be determined from a single word or sentence; the words must be construed in context, and provisions relating to the same subject matter must be harmonized to the extent possible."  (Lungren v. Deukmejian (1988) 45 Cal.3d 727, 735.)  Charter 55 must also "be given a reasonable and commonsense interpretation [that]

---

[5]      We requested that the City provide any materials relevant to ascertaining the intent of the voters when enacting Charter 55 in 1931 and all subsequent amendments thereto. The City provided three volumes of materials, including: (1) the original Charter, (2) city clerk documents reflecting all the Charter section revisions, (3) all the ballot materials in the city clerk's custody regarding amendments to Charter 55, and (4) publicly available city attorney documents interpreting Charter 55.  DCOP objected to some of the material submitted by the City as beyond the scope of our request.  Namely, DCOP objected to the City's submission of:  (1) another copy of Charter 55 (Tab 2); (2) a city clerk report dated January 8 regarding the history of updates to the Charter since 1931 (Tab 5); and legal memoranda by the city attorney addressing Charter 55 (Tabs 13-55).  As to this latter category of materials counsel for DCOP states in a declaration that the City omitted at least eight city attorney memoranda regarding Charter 55 that were not favorable to respondents' interpretation.  DCOP's objections to Tabs 2, 5, 13-55 are sustained as these materials are not relevant to ascertaining voter intent.  (*Hill v. National Collegiate Athletic Assn.* (1994) 7 Cal.4th 1, 16 [Indicia of voter intent " 'include the analysis and arguments contained in the official ballot pamphlet.' "].)  Because we do not consider the City's legal memoranda, we do not comment on DCOP's claim that the City selectively omitted material from its submission.

12

'when applied, will result in wise policy rather than mischief or absurdity.' " (Dyna-Med, Inc. v. Fair Employment & Housing Com. (1987) 43 Cal.3d 1379, 1392.)

Here, the trial court agreed with respondents' arguments that the City had the discretion to determine whether a particular park use would change the use or purpose of a park. Our review of Charter 55 supports this conclusion.

The first paragraph of Charter 55 gives the city manager "control and management of parks" and "recreation activities held on . . . parks." It also allows the city council "by ordinance [to] adopt regulations for the proper use and protection of said park property." In turn, the second paragraph of Charter 55 restricts the City's control and management authority by providing that dedicated parks "shall not be used for any but park, recreation or cemetery purposes without such changed use or purpose having been first authorized or later ratified by a vote of two-thirds of the qualified electors of the City voting at an election for such purpose."[6]

The plain language of Charter 55 provides that any "changed use or purpose" to a dedicated park requires voter approval. Whether an addition to a dedicated park constitutes a "changed use" necessarily falls within the City's control and management authority. This interpretation does not result in an absurdity and makes sense from a governance standpoint. Dedicated parks may often start as bare pieces of land. The City is then charged with exercising its management and control authority to determine

---

[6]     For ease of reference, we refer to this provision requiring voter approval for a changed use or purpose to a dedicated park as the "changed use restriction."

13

whether a proposed addition to a dedicated park would change its use or purpose and thus require voter approval.

The 1953 amendment to Charter 55 also supports the conclusion that only a "changed use or purpose" to a dedicated park requires voter approval. When the voters enacted Charter 55 in 1931 the changed use restriction was not limited to "dedicated parks." Rather, it broadly applied to all real property "designated or set aside for park, recreation or cemetery purposes." By amendment in 1953 city voters relaxed the changed use restriction by limiting its application to parks "formally dedicated in perpetuity by ordinance" for park, recreation or cemetery purposes. The 1953 amendment highlighted the distinction between "designated" and "dedicated" parks by expressly providing that "real property which has been heretofore or which may hereafter be set aside *without the formality of an ordinance or statute dedicating such lands for park, recreation or cemetery purposes may be used for any public purpose deemed necessary by the Council*." (Italics added.)

This distinction between *designated* parks and *dedicated* parks remains in effect under the current version of Charter 55. Thus, Charter 55 granted the City authority to use *designated* parks "for any public purpose" it deemed necessary, without requiring voter approval for a changed use. The City does not have the same authority over *dedicated* parks. Rather, the plain language of Charter 55 provides that the use and purpose of *dedicated* parks cannot be changed without voter approval. In other words, the City is free to use designated parks for any public purpose deemed necessary by the

14

city council, but it does not have this authority for dedicated parks. Rather, voter approval is necessary if a project changes the use or purpose of a dedicated park.

DCOP cites *Mulvey v. Wangenheim* (1913) 23 Cal.App. 268 (*Mulvey*) and *Hall v. Fairchild-Gilmore-Wilton Co.* (1924) 66 Cal.App. 615 (*Hall*) for the proposition that diversion of any portion of a dedicated park for nonpark use or nonrecreation is improper under Charter 55. *Mulvey* addressed a proposed road through a dedicated park that would have blocked ingress and egress to the park from two streets. (*Mulvey*, at pp. 268, 270.) *Hall* addressed a proposed road that would have taken over 60 percent of a dedicated park. (*Hall*, at pp. 619, 620.) Both cases were decided before enactment of Charter 55 in 1931 and pertain to earlier versions of the City Charter. (*Mulvey*, at p. 268; *Hall*, at p. 620.)

After its enactment in 1931, Charter 55 was amended in 1941 to allow the people, by a two-thirds vote, to modify the law "so as to designate boulevards, streets and highways in the parks and parkways as part of the public street and road system of the City and give to the Manager supervision over the construction, repair and maintenance thereof." In 1953 voters amended Charter 55 to provide: "Whenever the City Manager recommends it, and the City Council finds that the public interest demands it, the City Council may, without a vote of the people, authorize the opening and maintenance of streets and highways over, through and across City fee-owned land which has heretofore or hereafter been formally dedicated in perpetuity by ordinance or statute for park, recreation and cemetery purposes." Thus, the 1953 amendment to Charter 55 allowed the

15

City to open streets through dedicated parks without a public vote, authority the City lacked when *Mulvey* and *Hall* were decided.

Having decided that voter approval is necessary only if a project changes the use or purpose of a dedicated park, we turn to the record to examine whether it supports a conclusion that the Project does not change the use or purpose of the Park. If the record supports the City's conclusion that the Project does not change the use or purpose of the Park, the Project can be built without approval by two-thirds of qualified voters.

As relevant here, a "park" is defined as "an area of land, usually in a largely natural state, for the enjoyment of the public, having facilities for rest and recreation, often owned, set apart, and managed by a city, state, or nation." (Random House Unabridged Dict. (2d ed. 1993) p. 1411.) "Recreation" is defined as "a pastime, diversion, exercise, or other resource affording relaxation and enjoyment." (*Id.* at p. 1613.)

The Park is 8.53 acres in size, consisting of a large grass area bounded by a cement path, with two basketball courts surrounded by a 12-foot-high fence, circuit training equipment stations, a play structure, and picnic tables outside the cement path. The total footprint of the Project is 534 square feet or 0.14 percent of the total ground area of the Park. The Project will require relocating one piece of exercise equipment about 100 feet north of its current location. The 35-foot high faux tree will be installed in an existing stand of tall trees of varying heights, two of which are at least 50 feet high. An 11-foot by 20-foot concrete masonry unit (the unit) will contain equipment required for the Project. The unit will be located northeast of the faux tree and set back about 15

16

feet from the edge of the Park's sidewalk path. The unit will have a stucco finish, be painted a tan/sandstone color, and be surrounded by native shrubs. This evidence supports the City's determination that the Project will not change the use or purpose of the Park.

Moreover, the evidence in the record also supports a conclusion that the Project is consistent with park or recreation purposes as it will clearly benefit park visitors by providing enhanced wireless communication coverage. There is evidence in the record that, as of 2011, 70 percent of 911 calls originate from cellular telephones and that this percentage will continue to increase. At a Rancho Peñasquitos Planning Board Meeting, the president of the basketball association noted that not having cellular telephone service was an issue for coaches who practice at the Park if an emergency arises. Additionally, cellular telephone use is ubiquitous and growing. A FCC report noted that consumers are increasing their reliance on mobile broadband services and that the "volume of data crossing North American mobile networks will grow almost eight-fold [*sic*] between 2013 and 2018." The Project changes "poor" coverage in the Park to "excellent" coverage, a fact DCOP does not dispute. This constitutes more than an incidental benefit to Park users and undoubtedly enhances the enjoyment of the Park for those Park visitors who use their wireless communication devices to read books, watch movies, listen to music or play games.

As additional support for the trial court's order, respondents cite *Harter v. San Jose* (1904) 141 Cal. 659 (*Harter*), *Slavich v. Hamilton* (1927) 201 Cal. 299 (*Slavich*) and *City and County of S. F. v. Linares* (1940) 16 Cal.2d 441 (*Linares*) for the proposition

17

that nonpark uses in dedicated parks will be upheld, despite restrictive charter language, provided that the nonpark uses do not interfere with, change, or impair park purposes. DCOP asserts that these cases do not alter the limitations in Charter 55 prohibiting nonpark or nonrecreation uses.

While not necessary to the resolution of this appeal, we briefly address these cases. *Harter*, *Slavich* and *Linares* pertain to the proposed construction of, within dedicated parks or land devoted to park use, a hotel, memorial building, and subsurface public parking garage. (*Harter*, *supra*, 141 Cal. at p. 660 [hotel]; *Slavich*, *supra*, 201 Cal. at p. 302 [memorial building]; *Linares*, *supra*, 16 Cal.2d at pp. 442, 443 [subsurface parking garage].) In *Harter* and *Linares* the respective city charters specifically allowed for the construction of the proposed hotel and subsurface parking garage if the respective projects did not interfere with use of the land as a public park. (*Harter*, at pp. 660-661; *Linares*, at p. 443; see also *Humphreys v. San Francisco* (1928) 92 Cal.App. 69, 71-72, 73, 77 [city charter allowed construction of proposed tunnel on, under or over any city land].) Similarly, in *Slavich* the city charter allowed for the construction of buildings and structures for park purposes, with the court noting that it has been long recognized that the proposed memorial building was a use consistent with park purposes. (*Slavich*, at pp. 307, 308-309.)

In summary, existing case law instructs that courts must first address the specific city charter or any language dedicating the park to determine whether a proposed use is permissible. If the proposed use is permissible, courts then address whether the proposed

18

use would disrupt or interfere with park purposes.[7]  Here, Charter 55 provides that any changed use of a dedicated park must be approved or ratified by the voters.  As we discussed, the record amply supports a conclusion that the Project does not change the Park's use or purpose.  Because the proposed use is permissible, we address whether the Project would disrupt or interfere with park or recreation uses or purposes.

Adopted in 1962, and last amended in 1999, City Council Policy 700-06 addresses encroachments on City property and establishes guidelines to evaluate requested encroachments including "telecommunication facilities on parkland and open space." Policy 700-06 provides:  "<u>Dedicated or Designated Parkland and Open Space</u>:  The City may grant authorization for encroachment on dedicated or designated parkland and open space if it is determined by the responsible department that the requested action would not only meet criteria for General City property as stated above, but would also be consistent with City Charter Section 55; i.e., that it would not change or interfere with the use or purpose of the parkland or open space.  Permission for encroachment on dedicated or designated parkland and open space that would benefit only a private party shall not be granted."

---

[7]     Although not cited by respondents, we note that our high court *Spires v. Los Angeles* (1906) 150 Cal. 64 (*Spires*) followed this analysis.  In *Spires* the dedication provided for use of the land " 'as a public place forever for the enjoyment of the community in general.' "  (*Id.* at p. 66.)  The *Spires* court concluded "that the establishment of a public library, to which the visitors to the park have access, is consistent with such public enjoyment, and tends to enlarge it, we have no doubt."  (*Ibid.*)

Adopted in 1997, and last amended in 2005, City Council Policy 600-43 sets forth criteria for the City to evaluate applications for WCF's. Policy 600-43 addresses the processing of applications for WCF's in City parks, stating: "The City may grant authorization [for WCF's] on dedicated or designated parkland and open space if it is first determined by the Park and Recreation Department that the requested action would not only meet the criteria of this Policy, but would also be consistent with City Charter Section 55." This policy additionally states that proposed WCF's in City parks "must be disguised such that they do not detract from the recreational or natural character of the parkland or open space. Further proposed WCF's "must be integrated with existing park facilities and must not disturb the environmental integrity of the parkland or open space."

Policy 600-43 provides that it is to be used in conjunction with SDMC section 141.0420. SDMC section 141.0420 addresses WCF's and provides, in relevant part, that a proposed WCF in a dedicated park "shall be placed underground unless the Park and Recreation Director determines that an above-ground equipment enclosure would not violate Charter section 55."

In compliance with these policies the director of the City's Park and Recreation Department (the Park Director) "determined that the design and location of the facilities proposed for the . . . Park by Verizon . . . are such that those facilities will not detract from or interfere with the park or its uses. The features of the proposed mono-eucalyptus tree allow it to integrate with the other trees in the immediate vicinity. Also, the minimal footprint, height, location, and design features of the equipment housing allow [the] facility to integrate aesthetically. Because both facilities will be set back from the field,

20

they will not interfere with park uses."[8]  The evidence cited *ante* supports the City's conclusion that the Project would not disrupt or interfere with the park or recreation purposes of the Park.

On this point, the City's determination is entitled to some deference.  "An agency interpretation of the meaning and legal effect of a statute is entitled to consideration and respect by the courts . . . ."  (*Yamaha*, *supra*, 19 Cal.4th at p. 7.)  Charter 55 gives the City "control and management of parks" with the caveat that any changed use or purpose of a dedicated park must be authorized or ratified by the voters.  Here, the Park Director has a comparative interpretative advantage over the courts in evaluating how the Project will impact the Park because this issue is "entwined with issues of fact, policy, and discretion."  (*Yamaha*, at p. 12.)  Thus, while we are ultimately responsible for interpreting Charter 55, we give " 'great weight and respect' " to the City's construction.  (*Yamaha*, at p. 12.)

It is undeniable that the placement of items within dedicated parks is entwined with issues of fact, policy and discretion.  The City's conclusion that the Project does not interfere with the use or purpose of the Park touches upon policy issues within the purview of the Park Director and is not clearly erroneous.  Additionally, the City

---

[8]     Verizon explored a subterranean equipment vault, but several negative factors existed.  Construction of the vault would significantly impact the Park and adjacent Preserve as a large area would need to be excavated and then backfilled.  Above ground exhaust vents required to vent the cabinets would generate noise.  Finally, the location of the vault is within a 100-year flood plain, and underground vaults have been difficult to waterproof.

complied with its policies regarding encroachments on dedicated parkland and the processing of applications for WCF's in City parks. More importantly, the record does not support a contrary conclusion that the Project would disrupt or interfere with the park or recreation purposes of the Park.

E. *Conclusion*

Public comments reveal that local residents opposed the Project based on primarily aesthetic reasons, with health issues being a secondary concern. Regarding health concerns, the Act prevents local governments from impeding the siting and construction of cell towers that conform to the Federal Communication Commission's (FCC) radio frequency emissions standards. (47 U.S.C. § 332(c)(7)(B)(iv).) Here, a registered professional electrical engineer concluded in a radio frequency site compliance report that the Project would comply with FCC rules and regulations. While many local residents oppose the Project as an unwelcome addition to the Park's landscape based on aesthetic reasons, the Project satisfies the objective prerequisites established in advance by the City for the placement of a WCF within a dedicated park. On this record, the subjective preferences of local residents do not constitute substantial evidence upon which the City can properly deny Verizon's application.

We conclude that the Project does not constitute a changed use or purpose that required voter approval under Charter 55 and that DCOP has not presented evidence showing that the City failed to follow the law in permitting the Project.

22

## II.  *THE PROJECT IS EXEMPT FROM CEQA*

### A.  *CEQA Overview*

"CEQA was enacted to advance four related purposes:  to (1) inform the government and public about a proposed activity's potential environmental impacts; (2) identify ways to reduce, or avoid, environmental damage; (3) prevent environmental damage by requiring project changes via alternatives or mitigation measures when feasible; and (4) disclose to the public the rationale for governmental approval of a project that may significantly impact the environment.  [Citation.]  [¶] To further these goals, CEQA requires that agencies follow a three-step process when planning an activity that could fall within its scope." (*California Building Industry Assn. v. Bay Area Air Quality Management Dist.* (2015) 62 Cal.4th 369, 382.)

The first tier requires an agency to determine whether the proposed activity is a project and, if so, whether the project is exempt from CEQA.  (*San Lorenzo Valley Community Advocates for Responsible Education v. San Lorenzo Valley Unified School Dist.* (2006) 139 Cal.App.4th 1356, 1372-1373 (*San Lorenzo*).)  If an agency determines that a project is exempt, no further environmental review is necessary, and it may file a notice of CEQA exemption.  (*San Lorenzo*, at p. 1373.)  A project is exempt from CEQA if it is subject to a "categorical exemption" in sections 15301 to 15333 of the Guidelines (*San Lorenzo*, at p. 1381) and the application of the categorical exemption is not barred by an exception set forth in section 15300.2 of the Guidelines.  (*San Lorenzo*, at pp. 1380-1381.)  Exceptions to the categorical exemptions include, among other things,

where there is a reasonable possibility that the activity will have a significant effect on the environment due to unusual circumstances.  (Guidelines, § 15300.2, subd. (c).)

We analyze an agency determination that its decision is exempt from CEQA to " 'determine whether, as a matter of law, the [activity meets] the definition of a categorically exempt project.' "  (*San Lorenzo*, *supra*, 139 Cal.App.4th at p. 1386, italics omitted.)  Categorical exemptions are narrowly construed, "to afford the fullest possible environmental protection."  (*Save Our Carmel River v. Monterey Peninsula Water Management Dist.* (2006) 141 Cal.App.4th 677, 697.)  While our review is de novo, "in undertaking our independent analysis, we bear in mind the 'highly deferential' review standard that applies to the agency's factual determinations."  (*San Lorenzo*, at p. 1387.)

B.  *Exhaustion of Administrative Remedies*

Respondents argue that DCOP's CEQA claims are barred based on its failure to exhaust administrative remedies.  Specifically, they note that DCOP asserts on appeal that the Project does not qualify for an exemption under Guidelines section 15303 and that unusual circumstances prohibit application of the exemption, but that DCOP did not list these grounds in the administrative appeal or in any written materials submitted to the City.  DCOP contends that the exhaustion of remedies affirmative defense is inapplicable because the appeal it took to the city council was based on a staff level determination that the Project was exempt under a "Class 3" exemption under Guidelines section 15303 with no public hearing held prior to the April 15 determination date.  We agree with DCOP.

" 'The exhaustion of administrative remedies doctrine ". . . operates as a defense to litigation commenced by persons who have been aggrieved by action taken in an

24

administrative proceeding which has in fact occurred but who have failed to 'exhaust' the remedy available to them in the course of the proceeding itself." ' " (*Defend Our Waterfront v. State Lands Com.* (2015) 240 Cal.App.4th 570, 580-581.) CEQA's exhaustion provision requires a party to inform an agency of an alleged CEQA violation orally or in writing before filing a CEQA action in court. (Pub. Resources Code, § 21177, subds. (a) & (b).) CEQA provides an exception to the exhaustion requirement if "there was no public hearing or other opportunity for members of the public to raise those objections orally or in writing prior to the approval of the project, or if the public agency failed to give the notice required by law." (Pub Resources Code, subd. 21177, subd. (e).)

Here, the City determined on April 15 that the Project was exempt from CEQA. It later prepared and distributed a "Notice of Right to Appeal." DCOP filed an appeal later that month. There is nothing in the record, however, indicating that before the City determined that the Project was exempt it held a public hearing or otherwise provided members of the public the opportunity to raise oral or written objections. Rather, it appears that the City filed the notice of exemption before the Project had even been approved. Accordingly, the exception to the exhaustion requirement applies to DCOP's CEQA arguments.

C. *Analysis*

DCOP claims that the City erroneously claimed a Class 3 exemption because the Project was excepted from a Class 3 exemption and is subject to CEQA review because: (1) the Project does not fit within the meaning or use of the Class 3 exemption as a matter of law, (2) the unusual circumstances exemption applies, and (3) placement of the Project

25

in a dedicated park precludes use of a categorical exemption because such a location is of critical concern. We examine each argument in turn.

1. *Class 3 exemption*

DCOP contends that the Project does not qualify for a Class 3 exemption because it is a new stand-alone utility that is not an intended type of urban infill development encompassed by the Class 3 exemption. We disagree.

A Class 3 exemption under Guidelines section 15303 "consists of construction and location of [(1)] limited numbers of new, small facilities or structures; [(2)] installation of small new equipment and facilities in small structures; and [(3)] the conversion of existing small structures from one use to another where only minor modifications are made in the exterior of the structure."[9] There is a paucity of case law applying this

---

[9] "Examples of this exemption include but are not limited to: [¶] (a) One single-family residence, or a second dwelling unit in a residential zone. In urbanized areas, up to three single-family residences may be constructed or converted under this exemption. [¶] b) A duplex or similar multi-family residential structure totaling no more than four dwelling units. In urbanized areas, this exemption applies to apartments, duplexes, and similar structures designed for not more than six dwelling units. [¶] (c) A store, motel, office, restaurant or similar structure not involving the use of significant amounts of hazardous substances, and not exceeding 2[,]500 square feet in floor area. In urbanized areas, the exemption also applies to up to four such commercial buildings not exceeding 10,000 square feet in floor area on sites zoned for such use if not involving the use of significant amounts of hazardous substances where all necessary public services and facilities are available and the surrounding area is not environmentally sensitive. [¶] d) Water main, sewage, electrical, gas, and other utility extensions, including street improvements, of reasonable length to serve such construction. [¶] (e) Accessory (appurtenant) structures including garages, carports, patios, swimming pools, and fences. [¶] (f) An accessory steam sterilization unit for the treatment of medical waste at a facility occupied by a medical waste generator, provided that the unit is installed and operated in accordance with the Medical Waste Management Act (Section 117600 et

exemption. Nonetheless, the exemption has been applied to the installation of 726 telecommunications equipment boxes on city property. (*San Francisco Beautiful v. City and County of San Francisco* (2014) 226 Cal.App.4th 1012, 1021-1022 (*San Francisco Beautiful*).) The exemption has also been applied to the installation of small new telecommunications equipment on numerous existing small structures in scattered locations. (*Robinson v. City and County of San Francisco* (2012) 208 Cal.App.4th 950, 956.)

Here, applying the plain language of Guidelines section 15303, the Project consists of the construction and location of a new small facility or structure, which qualifies for a Class 3 exemption. The Projection is a new small facility that will be 534 square feet, including the above-ground branch diameter of the faux tree. While none of the examples of the exemption are directly applicable (*ante*, fn. 9), the Project is much smaller than a single-family residence, store, motel, office or restaurant. Accordingly, we hold that as a matter of law, the Project falls within the scope of the Class 3 categorical exemptions under the Guidelines.

2. *Unusual circumstances exception*

DCOP argues that, even if the Project falls within the Class 3 exemption, an environmental impact report is necessary because there is evidence the Project will have significant environmental impacts under the unusual circumstances exception.

seq., of the Health and Safety Code) and accepts no offsite waste." (Guidelines, § 15303.)

27

Guidelines section 15300.2, subdivision (c) states that "[a] categorical exemption shall not be used for an activity where there is a reasonable possibility that the activity will have a significant effect on the environment due to unusual circumstances."  In *Berkeley Hillside Preservation v. City of Berkeley* (2015) 60 Cal.4th 1086 (*Berkeley Hillside*), our high court delineated two alternative analyses in assessing whether the unusual circumstances exception applies.  (*Id.* at p. 1105.)  Under the first alternative "a challenger must prove both unusual circumstances and a significant environmental effect that is due to those circumstances.  In this method of proof, the unusual circumstances relate to some feature of the project that distinguishes the project from other features in the exempt class."  (*Citizens for Environmental Responsibility v. State ex. rel. 14th Dist. Ag. Assn.* (2015) 242 Cal.App.4th 555, 574.)  Under the second alternative a challenger "may establish an unusual circumstance with evidence that the project *will have* a significant environmental effect."  (*Berkeley Hillside,* at p. 1105, italic*s* added; *Citizens for Environmental Responsibility,* at p. 575.)

"Whether a particular project presents circumstances that are unusual for projects in an exempt class is an essentially factual inquiry," which we review under the traditional substantial evidence standard.  (*Berkeley Hillside*, *supra*, 60 Cal.4th at p. 1114.)  "[A]n agency's finding as to whether unusual circumstances give rise to 'a reasonable possibility that the activity will have a significant effect on the environment' (Guidelines, § 15300.2, subd. (c)) is reviewed to determine whether the agency, in applying the fair argument standard, 'proceeded in [the] manner required by law.' " (*Ibid*.)

28

a.  First alternative

" 'The Guidelines do not define 'unusual circumstances.'  That requirement was presumably adopted to enable agencies to determine which specific activities—within a class of activities that does not normally threaten the environment—should be given further environmental evaluation and hence excepted from the exemption.' "  (*San Francisco Beautiful*, *supra*, 226 Cal.App.4th at p. 1023.)  DCOP contends that the Project's location within a dedicated park is an unusual circumstance.  The City, however, presented evidence that at least 37 similar facilities exist in dedicated parks.  This evidence suggests that construction of the Project within the Park is not unusual.  Even assuming arguendo that the Project is unusual, for this exception to apply DCOP must also show a reasonable possibility that the unusual circumstances (i.e., construction of the Project in the Park) will cause a significant environmental effect.  (*Berkeley Hillside*, *supra*, 60 Cal.4th at p. 1105.)

Here, the Commission found that the faux tree and equipment enclosure are located so as not to interfere with Park uses.  It found that the Project would result in minimum disturbance to environmentally sensitive lands because minimal grading would be required to accommodate the caisson and footings for the faux tree, and trenching for the conduits between the faux tree and the equipment enclosure as well as the conduit for power would occur immediately adjacent to the main walking path from the street through the Park.  Additionally, the Project site consists of mostly disturbed habitat and does not contain environmentally sensitive lands.  The Project is approximately 95 feet east of a multi-habitat planning area (MHPA) boundary.  However, any impact was

29

considered insignificant and not requiring mitigation consistent with the City's Land Development Manual - Biology Guidelines. Any noise generated after completion of the Project from the cooling systems was also found to be insignificant.

The City had a biological resource report created for the Project. This report documented "the existing biological conditions within the project study area; identif[ied] potential impacts to biological resources that could result from implementation of the proposed project; and recommend[ed] measures to avoid, minimize, and/or mitigate significant impacts consistent with federal, state, and local rules and regulations . . . ." The report concluded that while there would be minor direct impacts to certain habitats, no mitigation was required. No special status species were identified on-site, but because the coastal California gnatcatcher is within the study area, the report recommended that construction of the Project not occur during certain time periods to avoid construction noise impacting the breeding season of these birds. After construction, it was determined that any noise generated from the Project would not impact potentially present special status species.

This evidence shows the City proceeded in the manner required by law when it determined that a reasonable possibility did not exist that the Project would have a significant effect on the environment. DCOP does not challenge the evidence showing that the Project will not significantly adversely impact the environment. Rather, DCOP asserts that the Project has an adverse environmental impact on aesthetics, and the park and recreational uses of the Park. The evidence in the record does not support a conclusion that the Project will cause a "significant" adverse change to aesthetics or park

30

and recreation uses.  The record contains before-and-after views; i.e., a photograph of the Park without the Project and the Project as built.  This evidence shows the Project will not significantly impede views from the Park or result in any other significant aesthetics impacts.  Additionally, placement of the faux tree will require moving a single piece of exercise equipment about 100 feet north from its current location.  DCOP presented no evidence showing how moving this single piece of exercise equipment will impact the Park and its recreational use.

b.  Second alternative

We next examine whether DCOP established unusual circumstances under the alternative method of showing that the Project will have a significant environmental effect.  (*Berkeley Hillside*, *supra*, 60 Cal.4th at p. 1105.)  "A significant effect on the environment" is "a substantial adverse change in the physical conditions which exist in the area affected by the proposed project."  (Guidelines, § 15002, subd. (g).)  As discussed *ante* in connection with the first alternative, the evidence shows that the Project will not cause a "significant" adverse change to the Park.  (*Ante*, pt. C.2.a.)

3.  *Location exception*

DCOP contends that the placement of the Project in a sensitive and protected resource area, a dedicated park, precludes use of a categorical exemption under subdivision (a) of Guidelines section 15300.2.  Respondents assert that DCOP forfeited this argument by not raising this issue during the administrative proceedings or before the trial court.  DCOP disputes this contention, arguing that it raised this issue before the trial

31

court. For purposes of analysis, we will assume, without deciding that DCOP did not forfeit this argument.

The location exception is restricted to projects that "may impact on an environmental resource of hazardous or critical concern where designated, precisely mapped, and officially adopted pursuant to law by federal, state, or local agencies." (Guidelines, § 15300.2, subd. (a).) DCOP presented no evidence that the Park is a location "designated" as an "environmental resource of hazardous or critical concern" by any federal, state or local agency. The lack of such a designation defeats application of this exception.

DCOP's reliance on *Salmon Protection & Watershed Network v. County of Marin* (2004) 125 Cal.App.4th 1098 is misplaced. In *Salmon Protection*, a county determined that the proposed construction of a home was categorically exempt from CEQA under an exemption for single-family homes, even though the home was adjacent to a protected anadromous fish stream and within a stream conservation area which the county conceded was of " 'critical concern. ' " (*Salmon Protection*, at p. 1106.) The *Salmon Protection* court held that the project was not exempt because the county relied upon proposed mitigation measures to grant a categorical exemption and that the "process of assessing those mitigation measures and weighing them against potential environmental impacts" must be conducted under established CEQA standards. (*Salmon Protection*, at p. 1108.) Here, unlike *Salmon Protection*, DCOP failed to identify any mitigation measures requiring assessment under CEQA.

In summary, we conclude that the City properly determined that the Project is categorically exempt under the CEQA Guidelines.

## DISPOSITION

The judgment is affirmed.  In the interests of justice, the parties are to bear their own costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(5).)


NARES, J.

WE CONCUR:


HUFFMAN, Acting P. J.


HALLER, J.