Filed 8/17/18

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| BRYAN PEASE, | D074405 |
| Contestant and Appellant, | |
| v. | (Super. Ct. No. 37-2018-00033348-CU-PT-CTL) |
| LORIE ZAPF, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of San Diego County, Peter C. Deddeh, Judge.  Affirmed.

Singleton Law Firm, Gerald B. Singleton and Trenton G. Lamere; Law Office of Bryan W. Pease and Bryan W. Pease for Contestant and Appellant.

The Sutton Law Firm, James R. Sutton, Bradley W. Hertz and Matthew C. Alvarez for Defendant and Respondent.

In November 1992, San Diego voters approved an amendment to the city charter that established a term limit for members of the San Diego City Council.

Bryan Pease is a city council candidate who did not qualify for the November 2018 general election. He contends Councilmember Lorie Zapf—who received the most votes in the primary election—is termed out of office and ineligible to run in the general election. He maintains he should be placed on the ballot instead. We disagree.

Here, the parties agree Councilmember Zapf represented District 6 during her first term of office and represented District 2 during her second term of office. The parties also agree that, as a result of redistricting that occurred during Councilmember Zapf's first term of office, she resided in District 2 for both terms. Based on her residency, Pease contends Councilmember Zapf has already served two consecutive terms from the same district and is termed out of office.

Because this interpretation is not supported by the language of the term limit provision and fails to take into account other relevant charter provisions, including the impact of the redistricting provision, we reject Pease's argument. The term limit provision regulates the number of terms an incumbent may serve on behalf of the electors of a given district, and is not dependent solely on residency. This holding follows from the language of the charter as a whole, while also giving due deference to the fundamental right of voters to select among eligible candidates to represent them in elected office.

Councilmember Zapf is eligible for reelection in the November 2018 general election. We affirm the trial court's judgment in her favor.

2

FACTUAL AND PROCEDURAL BACKGROUND

On November 2, 2010, Councilmember Zapf was elected to serve a four-year term on the San Diego City Council as the representative for District 6. At that time, District 6 encompassed Bay Ho (where Councilmember Zapf lived), Bay Park, Clairemont Mesa, Kearny Mesa, Serra Mesa, and Mission Valley. In the same year, then-Councilmember Kevin Faulconer, who lived in Point Loma, ran for and won reelection to serve on the city council as the representative for a neighboring district, District 2. Councilmembers Zapf and Faulconer were sworn into office on December 3, 2010.

Following the 2010 national decennial census, San Diego's Redistricting Commission—a panel of appointed voters with authority to approve city council district boundaries (San Diego City Charter, art. II, § 5.1)—adopted a plan to redraw San Diego's district boundaries, effective September 24, 2011.[1] As a result of redistricting, the newly-drawn District 2 included both Councilmember Faulconer's residence in Point Loma and Councilmember Zapf's residence in Bay Ho. Although the city charter provided a method to designate which district each council member would represent for the remainder of his or her term, there is no evidence the city council implemented this option. However, after redistricting, the city council's meeting agendas, minutes, and website continued to refer to Councilmember Faulconer as the representative for District

---

[1] The version of the San Diego City Charter in effect at the time provided that the Redistricting Commission's adoption of a redistricting plan "shall be effective thirty (30) days after adoption." (Former San Diego City Charter, art. II, § 5.1.) The Redistricting Commission approved the redistricting plan on August 25, 2011. Therefore, the redistricting plan was effective on September 24, 2011.

3

2 and Councilmember Zapf as the representative for District 6, and the council members acted in those official capacities for the remainder of their terms.

In a 2014 special election, Councilmember Faulconer was elected the mayor of San Diego and, in the 2014 general election, Councilmember Zapf was elected to city council as the representative for District 2, the district in which her Bay Ho residence was located due to the redistricting that had occurred in 2011. Councilmember Zapf was sworn into office on December 10, 2014, and her term will end in December 2018.

Councilmember Zapf and several other candidates campaigned for the soon-to-be-vacant position of District 2 representative on the city council. In the primary election held on June 5, 2018, Councilmember Zapf and Dr. Jennifer Campbell were the top two vote-getters and thus qualified for the ballot in the upcoming general election. Councilmember Zapf received 43 percent of the vote and Dr. Campbell received 21 percent of the vote.[2] Pease, who finished the primary race in third place with 20 percent of the vote, did not qualify for the general election.

On July 6, 2018, Pease filed a petition under Elections Code section 16101,[3] in which he challenged Councilmember Zapf's eligibility for office and asked the trial court

---

[2] The top two vote-getters in a primary election to fill an elective city office qualify for the general election, irrespective of whether one candidate has received a majority of votes cast for all candidates. (San Diego City Charter, art. II, § 10.)

[3] All further statutory references are to the Elections Code, unless otherwise noted.

4

to set aside her nomination and declare him nominated for the general election.[4]

According to Pease, Councilmember Zapf's nomination contravenes the voter-approved term limit provision in the city charter and thus she is ineligible to run for another term. That provision states "no person shall serve more than two consecutive four-year terms as a Council member from any particular district." (San Diego City Charter, art. III, § 12, subd. (c).) A partial term in excess of two years is treated as a full term under the term limit provision. (*Ibid.*)

In the trial court, Pease initially argued that, effective upon the date of redistricting, Councilmember Zapf no longer represented District 6 and instead began to represent District 2, where she resided. In support of this argument, Pease contended that upon redistricting, a council member represents the newly drawn district in which he or she resides, not the district that elected the council member.[5] Based on this theory, Pease maintained that Councilmember Zapf had already served two terms as the council member for District 2—one term from the effective date of redistricting until 2014

---

[4]     Section 16101 states in pertinent part as follows: "Any candidate at a primary election may contest the right of another candidate to nomination to the same office by filing an affidavit alleging . . . [¶] . . . [t]he defendant is not eligible to the office in dispute."

[5]     Pease based this argument on a city charter provision in effect at the time redistricting took place in 2011, which stated in pertinent part as follows: "Upon any redistricting pursuant to the provisions of this Charter, incumbent Council members will continue to represent the district in which they reside, unless as a result of such redistricting more than one incumbent Council member resides within any one district, in which case the City Council may determine by lot which Council member shall represent each district." (Former San Diego City Charter, art. III, § 12, subd. (g).)

(which, as discussed *ante*, was treated as a full term in office) and a second term from 2014 to the present. In opposition, Councilmember Zapf emphasized that Pease's argument would lead to irrational results and require the court to find that District 6 was "unrepresented" and District 2 was "represented by two Councilmembers."

Shortly before the hearing on the petition, Pease filed a reply brief in which he modified his legal challenge. In this brief, Pease conceded for the first time that Councilmember Zapf "could, and apparently did, represent . . . District 6" throughout her first term of office, even after redistricting. Nevertheless, he argued that Councilmember Zapf represented District 6 *from* her residence in the newly-drawn District 2 and, therefore, has already served two terms " 'from a particular district.' "

On July 30, 2018, the trial court issued findings of fact and conclusions of law and pronounced judgment in favor of Councilmember Zapf.[6] The court found that after redistricting took place, Councilmember Zapf continued to represent District 6.[7] Although the court did not specifically address Pease's new argument that Councilmember Zapf represented District 6 *from* District 2 after redistricting, the court also concluded that "Councilmember Zapf has not yet served two consecutive four-year

---

[6] This document is file stamped June 30, 2018, but the court signed it on July 30, 2018, the same day as the hearing on the petition.

[7] The trial court reached this finding based on provisions in the city charter stating that a council member's term of office is four years, unless otherwise provided in the city charter, and redistricting does not terminate a council member's term of office. (Former San Diego City Charter, art. II, § 5.1; *id.*, art. II, § 7; *id.*, art. III, § 12, subd. (e).)

terms 'from any particular district' " and "is eligible for re-election as District 2 Councilmember for the 2018-2022 term."

Pease appeals the judgment under section 16920.

DISCUSSION

I. *The Doctrine of Laches Does Not Apply*

Before we turn to the merits of this appeal, we first address Councilmember Zapf's contention that the doctrine of laches forecloses this lawsuit because Pease waited until after the election to challenge her eligibility.  " 'Laches is based on the principle that those who neglect their rights may be barred, in equity, from obtaining relief . . . .  The elements required to support a defense of laches include unreasonable delay and either acquiescence in the matter at issue or prejudice to the defendant resulting from the delay . . . .' " (*Krolikowski v. San Diego City Employees' Retirement System* (2018) 24 Cal.App.5th 537, 568.)  The party relying on laches has the burden of proving its application. (*Miller v. Eisenhower Medical Center* (1980) 27 Cal.3d 614, 624.)  The trial court concluded that Pease's challenge was "not barred by the doctrine of laches," and we find no basis to disturb this determination.

Section 16421 permits a candidate in a primary election to contest the nomination of another candidate up to five days after the official canvass of the election. (§ 16421.) Here, the San Diego City Clerk certified the results of the canvass of votes cast in the primary election on July 5, 2018, and Pease filed this lawsuit the next day, thus satisfying

7

section 16421.[8] We acknowledge that a postelection challenge of this nature, particularly where a pre-election remedy is available, leaves the door open to "instability" and the regrettable possibility that the will of the voters may be nullified. (*McKinney v. Superior Court* (2004) 124 Cal.App.4th 951, 960 (*McKinney*).) Nevertheless, Pease's compliance with section 16421 undercuts Councilmember Zapf's claim of unreasonable delay.[9] (*David Welch Co. v. Erskine & Tulley* (1988) 203 Cal.App.3d 884, 893-894, disapproved on other grounds in *Lee v. Hanley* (2015) 61 Cal.4th 1225, 1239.)

Councilmember Zapf also has not demonstrated prejudice resulting from the purported delay. Councilmember Zapf argues that she "expended a tremendous amount of time and effort in running for re-election," without providing detail to substantiate these allegations or an explanation that ties the asserted harm to Pease's purported delay. Generic and unsupported allegations of this nature are insufficient to establish prejudice. (*In re Marriage of Parker* (2017) 14 Cal.App.5th 681, 689.) Accordingly, we reject the claim of laches and turn now to the merits of the appeal.

---

[8]    In his opening brief, Pease asked us to take judicial notice of a news article reporting that the city clerk certified the results of the canvass of votes on July 5, 2018. We deny the procedurally improper request, as the California Rules of Court require that a party seeking judicial notice "serve and file a separate motion with a proposed order." (Cal. Rules of Court, rule 8.252(a)(1).) However, our disposition of this request matters little, given that the date of the official canvass is undisputed.

[9]    Councilmember Zapf argues that *McKinney*, *supra*, 124 Cal.App.4th 951 supports her claim of unreasonable delay. We disagree. In *McKinney*, an elector sought a writ of mandate to nullify the results of an election and argued that one of the losing candidates in that election was ineligible to run. (*Id.* at p. 955.) The court denied the elector's petition and found that he should have sought relief pre-election, in large part because the Elections Code did not expressly authorize the elector to bring his claim postelection. (*Id.* at pp. 958-959.) By contrast, section 16421 permits this postelection challenge.

II.     *The Term Limit Provision Does Not Foreclose Councilmember Zapf's Nomination*

        A. *General Legal Principles*

"San Diego is a charter city.  It can make and enforce all ordinances and regulations regarding municipal affairs subject only to the restrictions and limitations imposed by the city charter, as well as conflicting provisions in the United States and California Constitutions and preemptive state law.  Consequently, ' "[within] its scope, such a charter is to a city what the state Constitution is to the state." ' " (*Grimm v. City of San Diego* (1979) 94 Cal.App.3d 33, 37.)  The San Diego City Council possesses authority under the California Constitution and the city charter to place proposed city charter amendments on the ballot to be considered and voted upon by the electors at municipal elections.  (Cal. Const., art. XI, § 3, subd. (b); San Diego City Charter, art. XIV, § 223.)

"The principles of construction that apply to statutes also apply to the interpretation of charter provisions.  [Citation.]  'In construing a provision adopted by the voters our task is to ascertain the intent of the voters.'  [Citation.]  'We look first to the language of the charter, giving effect to its plain meaning.  [Citation.]  Where the words of the charter are clear, we may not add to or alter them to accomplish a purpose that does not appear on the face of the charter or from its legislative history.'  [Citation.]  ' "An interpretation that renders related provisions nugatory must be avoided . . . , [and] each sentence must be read . . . in the light of the [charter's overall] scheme . . . ." '  [Citation.]  'When statutory language is susceptible of more than one reasonable interpretation, courts should consider a variety of extrinsic aids, including the ostensible objects to be

9

achieved, the evils to be remedied, the legislative history including ballot pamphlets, public policy, contemporaneous administrative construction and the overall statutory scheme.' " (*Don't Cell Our Parks v. City of San Diego* (2018) 21 Cal.App.5th 338, 349 (*Don't Cell Our Parks*).)

We also must remain cognizant that "the right to hold public office, either by election or appointment, is one of the valuable rights of citizenship." (*Carter v. Commission on Qualifications of Judicial Appointments* (1939) 14 Cal.2d 179, 182.) Accordingly, "[t]he exercise of this right should not be declared prohibited or curtailed except by plain provisions of law." (*Ibid.*; *Woo v. Superior Court* (2000) 83 Cal.App.4th 967, 977 (*Woo*) [the right to run for public office may "be curtailed only if the law clearly so provides"].)

The interpretation of a city charter presents a legal issue we review de novo on appeal. (*Don't Cell Our Parks*, *supra*, 21 Cal.App.5th at pp. 349-350; *City of San Diego v. Shapiro* (2014) 228 Cal.App.4th 756, 789 ["This claim turns on the proper interpretation of the City charter, an issue that we review de novo."].)

B. *Application*

The San Diego city charter states "no person shall serve more than two consecutive four-year terms as a Council member from any particular district." (San Diego City Charter, art. III, § 12, subd. (c).) This appeal requires us to interpret the meaning of the phrase "from any particular district," as it is used in the context of this term limit provision. Pease contends that the phrase "from any particular district" precludes an individual from serving as a council member for more than two consecutive

10

terms while *residing* in a given district. By contrast, Councilmember Zapf claims that it precludes a person from serving more than two consecutive terms *while representing* the same district. Considering the term limit provision, along with other relevant city charter provisions, we agree with Councilmember Zapf's interpretation.

The city charter requires each council member to be "an actual resident and elector of the district from which the Council-member is nominated," and provides that "[t]he office of a Councilmember shall be vacated if he or she moves from the district from which the Councilmember was elected." (San Diego City Charter, art. II, § 7.) However, where, as a result of redistricting, a council member's residence is relocated into a different, newly drawn district, the council member may continue to represent the district that elected him or her even though the council member no longer resides in that district.[10] All parties agree that is what occurred here—after redistricting, Councilmember Zapf continued to serve as the representative for District 6, even though she resided in the newly drawn District 2.

With that context in mind, we turn to the issue at hand—how to interpret the term limit provision stating that "no person shall serve more than two consecutive four-year terms as a Council member from any particular district." (San Diego City Charter, art.

_____

[10]    As discussed *ante*, the city charter in effect in 2011 stated that, in the case of redistricting, an incumbent council member would represent the district in which he or she resided. (Former San Diego City Charter, art. III, § 12, subd. (g).) However, if multiple council members resided in the same newly-drawn district, the city council could determine which incumbent council member represented which district. (*Ibid.*) Now, the city charter provides that, upon redistricting, an incumbent council member continues to represent the district that elected him or her for the remainder of the council member's term. (San Diego City Charter, art. III, § 12, subd. (d).)

III, § 12, subd. (c).) In doing so, we must "not interpret . . . [this] charter provision[] . . . in isolation." (*Mason v. Retirement Board* (2003) 111 Cal.App.4th 1221, 1229.) And, we " ' "construe [the charter provision] with reference to the entire scheme of law of which it is part so that the whole may be harmonized and retain effectiveness." ' " (*Ibid*.)

In support of his argument that the term limit provision depends on a candidate's residency, Pease focuses exclusively on the word "from" within the phrase "from any particular district." Pease maintains "from" connotes a "physical location" and, based on this definition, concludes Councilmember Zapf has already served two consecutive terms of office "from [a] particular district": the first while living in Bay Ho representing District 6 and the second while still living in Bay Ho representing District 2. By isolating the word "from," divorced from its context and surrounding language, Pease violates well-settled rules of construction applicable to charters. (*The Internat. Brotherhood of Boilermakers, etc. v. NASSCO Holdings Inc.* (2017) 17 Cal.App.5th 1105, 1120 ["we must read the language as it is placed in the [charter] section, and in the context of the entire [charter] scheme"].)

Rather than focusing exclusively on the isolated word "from" or the equally isolated phrase "from any particular district," our traditional rules of construction require us to read this charter language in context. Read in context, "from any particular district" is not a standalone phrase, but a phrase that modifies the words immediately preceding it, i.e., the words "Council member." Thus, the term limit provision does not limit a person's ability to *serve* from a particular district. It limits a person's ability to serve "*as a*

12

*Council member* from any particular district." (San Diego City Charter, art. III, § 12, subd. (c), italics added.)

Having reached this conclusion, we consider what it means to serve "as a Council member from [a] particular district." We do so in light of other relevant city charter provisions, including the following:

- Section 5.1 (titled "Redistricting Commission"), which states that "[t]he members of the City Council shall be elected by districts" and "districts shall be used for all elections of Council members, including their recall, and for filling any vacancy in the office of member of the Council . . . ." (San Diego City Charter, art. II, § 5.1.)

- Section 10 (titled "Elections"), which states that "City Council members shall be nominated and elected by the electors of the district for which elective office they are a candidate." (*Id.*, art. II, § 10.)

- Section 23 (titled "Initiative, Referendum and Recall"), which states that "the recall of a Council member . . . shall require a petition signed by fifteen percent of the registered voters of the Councilmanic District . . . ." (*Id.*, art. III, § 23.)

For purposes of this appeal, the important point to be drawn from these provisions is the existence of separate geographical districts, along with the power of the electors in those districts to elect their respective council members. For instance, sections 5.1 and 10 provide that a person serves as a council member from a given district if that district nominates and elects that person to office. (San Diego City Charter, art. II, §§ 5.1, 10.) Section 23 reinforces the power of a district's electors by providing them authority to recall a council member if the member does not suitably represent the district's interests. (*Id.*, art. III, § 23.) And, as our court observed in an appeal involving city council districts, provisions such as these ensure that after a council member attains office, the council member "look[s] more to the needs of his [or her] own district than to those of the

13

city at large," such that a council member is "the representative of his [or her] own district [more so] than the city as a whole." (*D'Adamo v. Cobb* (1972) 27 Cal.App.3d 448, 451.)

These provisions and precedent make clear that the question whether a person serves as "a Council member from [a] particular district" depends on the identity of the district and the electors that *elected* the council member and on whose behalf the council member *serves*. Read in context, the term limit provision acts as a cap on a member's ability to serve more than two consecutive terms for the district that elected that member and on whose behalf the member serves, not the council member's geographical location or residency.

Even if we were to focus on the isolated word "from" without any context, as Pease does, that word does not support Pease's interpretation of the term limit provision. Pease relies on a Merriam-Webster's dictionary definition of "from," which defines "from" as a "function word to indicate the source, cause, agent or basis . . . ." (Webster's 11th New Collegiate Dict. (2003) pp. 502-503.) However, this definition undermines Pease's argument, given that District 6—not District 2—elected Councilmember Zapf in 2010 and thus acted as the "source, cause, agent, or basis" of her term in office. Pease also relies on an alternative definition from Merriam-Webster's dictionary that defines "from" as "a function word to indicate the starting or focal point of an activity . . . ." (*Ibid.*) Once again, this definition supports Councilmember Zapf's position. The "focal point" of her first term of office was District 6, on behalf of which she acted while serving as its council member. Pease provides a third dictionary definition as well, which

14

defines "from" as "a starting point of a physical movement or a starting point in measuring or reckoning . . . ." (*Ibid*.) To the extent this definition applies at all, the "starting point" of Councilmember Zapf's term of office was District 6, where she resided when her term began in 2010. Thus, the definitions of the word "from" that Pease offers do not support his argument. Quite the opposite, they undercut it.

Further, if the term limit provision did in fact depend on the residency of the council member in question, as Pease claims, we would have expected that the provision would have expressly stated as much. (*Wilson v. Safeway Stores* (1997) 52 Cal.App.4th 267, 272 ["We may not speculate that the Legislature meant something other than what it said, nor may we rewrite a statute to make express an intention that did not find itself expressed in the language of that provision."].) For example, the term limit provision could have stated as follows: "No person shall serve more than two consecutive four-year terms as a Council member *while he or she resides in* any particular district." However, it does not.

This is particularly noteworthy, given that city charter provisions expressly use the terms "resident" and "residency" when a person's residency is material. For instance, the city charter states that "[a]n elective officer of the City shall be a *resident* and elector of the City." (San Diego City Charter, art. II, § 7, italics added; see also former San Diego City Charter, art. III, § 12, subd. (g) ["Upon any redistricting pursuant to the provisions of this Charter, incumbent Council members will continue to represent the district *in which they reside*, unless as a result of such redistricting more than one incumbent Council member resides within any one district, in which case the City Council may

15

determine by lot which Council member shall represent each district."], italics added.) The differences in terminology used in these provisions, on the one hand, and the term limit provision, on the other hand, reinforce our conclusion that the term limit provision does not depend on a candidate's residency. (*Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1117 ["Where different words or phrases are used in the same connection in different parts of a [city charter], it is presumed the [electorate] intended a different meaning."].) Rather, as discussed *ante*, it turns on the identity of the district on behalf of which the council member has served.

Although we resolve this appeal based on the provision's plain and unambiguous language, we would reach the same conclusion were we to find ambiguity. "In our democracy the right to seek and hold public office has been accorded special, sensitive protection as a fundamental and valuable constitutional right by our California courts." (*Eldridge v. Sierra View Local Hosp. Dist.* (1990) 224 Cal.App.3d 311, 316.) Thus, we interpret ambiguity, even in term limit measures, "in favor of eligibility to hold office." (*Woo*, *supra*, 83 Cal.App.4th at p. 977 [construing term limit provision to permit incumbent city council member to run for reelection]; *White v. City of Stockton* (2016) 244 Cal.App.4th 754, 761 ["Because the measure does not contain an express and clearly written cumulative limitation, we are required to resolve any ambiguity in favor of eligibility to run for office."].) Our interpretation of the city charter provision at issue promotes the rights of individuals like Councilmember Zapf to seek and hold public office. Pease's interpretation, by contrast, would accomplish the opposite result.

16

Pease contends that, to the extent ambiguity exists, the purpose, legislative history, and public policy of the term limit provision support his reading of the provision. According to Pease, the intent of the provision was "to prevent councilmembers from running for reelection with the benefit of incumbency after serving two terms." However, the provision at issue here does not reflect a desire to limit incumbency to the degree Pease presupposes. It does not impose a lifetime bar on an incumbent's ability to run for a previously held seat and instead limits the member's ability to run for more than two *consecutive* terms. (*Conde v. City of San Diego* (2005) 134 Cal.App.4th 346, 349-351 (*Conde*).) As all parties agree, the term limit provision also does not preclude a council member from residing in and representing one district for two terms, then moving to another district and representing that district for two terms. Thus, Pease overstates the alleged purpose and public policy underpinning the term limit provision.

Pease also cites extrinsic aids in support of his arguments relating to the supposed purpose, legislative history, and public policy of the term limit provision. He quotes from a city council resolution that put the term limit provision on the ballot, which states that term limits would " 'eliminat[e] or reduc[e] unfair advantages enjoyed by incumbents, restor[e] open access to the political process, and stimulat[e] the voters' participation in the electoral process.' " He also points to language from the ballot pamphlet, which states: "We can guarantee that the power of incumbents <u>'STOPS'</u> after two terms --- by voting <u>'YES'</u> on Proposition A." We recognize that, under appropriate circumstances, such materials can be of assistance when resolving ambiguity. (*Robert L. v. Superior Court* (2003) 30 Cal.4th 894, 901.) However, these particular materials are

17

silent on the critical issue in this appeal—whether the application of a term limit depends on the district an incumbent *represents* or the one in which he or she *resides*—and thus do not support Pease's argument. Further, they—like Pease—" 'overstate[] the [positive] effects of the [term limit] measure,' " and thus are " 'not highly authoritative in construing the measure.' " (*Conde*, *supra*, 134 Cal.App.4th at pp. 350-351.)

For all these reasons, we conclude that the term limit provision in San Diego's city charter plainly and unambiguously caps the number of terms an incumbent may serve *on behalf of the district* from which he or she has drawn her authority to serve on the city council, not the number of terms that an incumbent may serve while *physically residing* within the geographic boundaries of any one district. Thus, the term limit provision does not render Councilmember Zapf ineligible to seek reelection in the November 2018 general election.[11]

---

[11] In light of our holding, we do not address the parties' arguments regarding the appropriate remedy had Pease prevailed in this challenge.

DISPOSITION

The judgment of the trial court is affirmed.


HALLER, Acting P. J.

WE CONCUR:


IRION, J.


GUERRERO, J.

19