Filed 1/7/22

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| LOUIS LOZANO et al., | B307412 |
| Plaintiffs and Appellants, | Los Angeles County Super. Ct. No. 19STCP00168 |
| v. | |
| CITY OF LOS ANGELES et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Mary H. Strobel, Judge.  Affirmed.

Law Offices of Gregory G. Yacoubian and Gregory G. Yacoubian for Plaintiffs and Appellants.

Michael N. Feuer, City Attorney, Carlos De La Guerra, Assistant City Attorney, and Paul L. Winnemore, Deputy City Attorney, for Defendants and Respondents.

Louis Lozano and Eric Mitchell (petitioners), former police officers for the City of Los Angeles (the City), filed a petition for writ of administrative mandate challenging the City's decision to terminate their employment. A board of rights found petitioners guilty on multiple counts of misconduct, based in part on a digital in-car video system (DICVS) recording that captured petitioners willfully abdicating their duty to assist a commanding officer's response to a robbery in progress and playing a Pokémon mobile phone game while on duty. Petitioners contend the City proceeded in a manner contrary to the law by using the DICVS recording in their disciplinary proceeding and by denying them the protections of the Public Safety Officers Procedural Bill of Rights Act (Gov. Code, § 3300 et seq.) (POBRA or the Act).[1] The trial court denied their petition. We affirm.

## FACTS AND PROCEDURAL HISTORY

Consistent with our standard of review, we state the facts established by the evidence at the board of rights hearing in the light most favorable to the trial court's factual findings, drawing all reasonable inferences and resolving all evidentiary conflicts to uphold the court's judgment. (*Molina v. Board of Administration, etc.* (2011) 200 Cal.App.4th 53, 61 (*Molina*); *Steinert v. City of Covina* (2006) 146 Cal.App.4th 458, 462, 465 (*Steinert*); *Jaramillo v. County of Orange* (2011) 200 Cal.App.4th 811, 815 (*Jaramillo*).)

---

[1] Statutory references are to the Government Code, unless otherwise designated

2

### 1. *Radio Call for a Robbery in Progress at the Crenshaw Mall*

On Saturday, April 15, 2017, petitioners were working as partners assigned to a foot beat patrol in the Los Angeles Police Department (LAPD or Department) Southwest Division. Petitioners' primary responsibilities included providing community services and addressing "quality of life" issues in the Crenshaw Corridor and Leimert Park area. Sergeant Jose Gomez was petitioners' patrol supervisor that day. Captain Darnell Davenport was the patrol commanding officer for the Southwest Division.

It was a "busy" Saturday in the Southwest Division— there were more calls than police cars available to respond and there had been a homicide earlier in the day. While en route to the homicide scene, Captain Davenport heard a radio call for "a 211 [robbery] in progress" with multiple suspects at the Macy's in the Crenshaw Mall. When the call came in, the Captain could see the Macy's from where he was stopped, and to his right he noticed a police car tucked back in an alley just feet away. He was not able to identify the unit, and when the unit did not respond to the radio call, the Captain assumed it might be a traffic unit or a unit from a different division using a different radio frequency. Consequently, Captain Davenport decided he would respond to the call and notified communications he was going "Code 6 on the call"—i.e., responding to the location of the robbery. At around the same time, the Captain saw the police car start to back up down the alley, then negotiate a left-hand turn to leave the area.

Sergeant Gomez was in the watch commander's office when the robbery in progress call went out. He described the

next five to seven minutes as "chaotic," with communications sending constant "updates as to what was happening at Macy's." As Captain Davenport went Code 6 on the robbery, Sergeant Gomez looked at the watch commander's board and saw petitioners' unit was Code 6 (located) in the Crenshaw Corridor. He attempted to radio petitioners' unit and requested they respond to the Crenshaw Mall to assist the Captain, but he received no response. Simultaneously, a unit broke away from the homicide crime scene and went Code 3 (red lights and sirens) from across the division to assist at the mall. Sergeant Gomez queried communications again for petitioners' response. Communications replied, " 'No,' and that was it."

## 2. *Sergeant Gomez's Meeting with Petitioners*

When Sergeant Gomez returned to the station he realized petitioners had initiated their Code 6 on the Crenshaw Corridor at approximately the same time that Captain Davenport went Code 6 on the robbery in progress. This seemed "peculiar" to him and he "wanted to find out what happened."

Sergeant Gomez contacted petitioners and arranged to meet with them later that evening at a 7-Eleven parking lot where they were conducting an illegal merchandise investigation. When the investigation concluded, the Sergeant asked petitioners to clarify what their duties were as the foot beat patrol car. Officer Lozano explained their primary responsibility was community relations with citizens and businesspeople, adding "the main issues are Leimert Park."

After discussing their duties, Sergeant Gomez asked petitioners if they had heard a call for "backup at Crenshaw Mall for a 211." Officer Mitchell said he had not, while Officer Lozano said he heard Captain Davenport was Code 6 at the Crenshaw

4

Mall but he did not hear a request for backup. Sergeant Gomez counseled petitioners that " 'we have to listen to the radio,' " " '[i]t's what our livelihood and our safety depends on,' " and he asked them "if their radios were working." Officer Mitchell responded that there was "a lot of music" and it was "really loud in the park . . . [,] especially on Saturdays." Officer Lozano concurred, adding, " 'we have no control over the [public announcement] system and all the loud noise, it was loud.' " Sergeant Gomez acknowledged he "couldn't dispute that," and he advised petitioners "to move to a location where [they] could hear the radio" if they found themselves in a loud area in the future.

Sergeant Gomez asked petitioners if they had any questions regarding his concerns and he reiterated that the best practice was to be in a location where they could hear the radio. In his testimony to the board of rights, the Sergeant explained: "At that point, my understanding was that the [robbery] call wasn't heard because they were at the park. And like I said, I could not dispute that." He concluded the meeting by advising petitioners that he was "counseling them for not listening to the radio" and "left it at that."

### 3. *The DICVS Recording and Misconduct Investigation*

Sergeant Gomez was still uneasy about the timing of petitioners' Code 6 on the Crenshaw Corridor when he came into work the following day. It then dawned on him to review their patrol unit's DICVS recording to "find out what they do on their average day."

Sergeant Gomez's review of the DICVS recording revealed new and disturbing facts: It had been petitioners' patrol unit that Captain Davenport saw in the alley only a short distance from the mall; petitioners did hear the radio call about a robbery

5

in progress; they discussed the call and whether they should assist Captain Davenport; and they went Code 6 on the Crenshaw Corridor to conceal that they had decided not to respond to the call.

The DICVS recording disclosed that, immediately after Captain Davenport's Code 6 broadcast, Officer Lozano asked Officer Mitchell if they were Code 6 on the Crenshaw Corridor or on the corner near the mall where they were parked. Mitchell responded they were "[a]t the corner" and noted the broadcast radio call was "Davenport." Lozano then instructed Mitchell to put them Code 6 "at the corridor," adding (after some laughter) regarding Captain Davenport, "I don't want to be his help." Petitioners' unit then moved backwards through the alley and turned away from the mall, as Captain Davenport had observed.

For the next several minutes the DICVS captured continued radio traffic regarding the robbery and pursuit of multiple suspects. After communications made a second attempt to contact petitioners, Officer Lozano asked if they should "ask [communications] if there's a message." Officer Mitchell replied, "It's up to you. Whatever you think. I don't want them to think we're not paying attention to the radio." Lozano responded, "Aw, screw it." Petitioners made no attempt to respond over the radio when their unit was called.

Sergeant Gomez notified the watch commander about petitioners' conduct and what the DICVS recording disclosed. His concerns were forwarded up the chain of command and the Sergeant was ultimately instructed to prepare the face sheet of a misconduct complaint against petitioners.

Detective Tracy McClanahan conducted the misconduct investigation, focusing on allegations that petitioners failed

6

to respond to a robbery in progress call, made false statements to a supervisor, and neglected to handle a radio call. Her investigation primarily involved multiple reviews of the DICVS recording and interviews with Captain Davenport, Sergeant Gomez, Commander Gerald Woodyard (who oversaw the foot beat units), and Officers Lozano and Mitchell.

Officers Lozano and Mitchell told Detective McClanahan they did not respond to the robbery in progress call because Captain Davenport did not request backup and because they were instructed to stay in their assigned area of the Crenshaw Corridor. Commander Woodyard said he did not give petitioners that instruction and insisted they should have responded to the call. Based on the interviews and the DICVS recording, Detective McClanahan concluded petitioners willfully failed to respond to the robbery call and attempted to conceal the fact by "placing themselves Code 6 somewhere else."

After carefully listening to the DICVS recording a number of times, Detective McClanahan also became concerned that petitioners were playing "the Pokémon Go video game" while on duty the day of the robbery.[2] The recording showed that,

---

[2] According to evidence admitted at the board of rights hearing, Pokémon Go is an "augmented reality" mobile phone game that "uses the mobile device GPS to locate, capture, battle, and train virtual creatures, called Pokémon, which appear as if they are in the player's real-world location." The game is credited with "popularizing location-based and [augmented reality] technology, promoting physical activity, and helping local businesses grow due to increased foot traffic." However, the game also "attracted controversy for contributing to accidents and creating public nuisances."

at approximately 6:09 p.m. (just five minutes after Officer Lozano said "screw it" to checking in with communications about the robbery call), Officer Mitchell alerted Lozano that "Snorlax" "just popped up" at "46th and Leimert."[3] After noting that "Leimert doesn't go all the way to 46th," Lozano responded, "Oh, you [know] what I can do? I'll [go] down 11th and swing up on Crenshaw. I know that way I can get to it." Mitchell suggested a different route, then told Lozano, "We got four minutes."

For approximately the next 20 minutes, the DICVS captured petitioners discussing Pokémon as they drove to different locations where the virtual creatures apparently appeared on their mobile phones. On their way to the Snorlax location, Officer Mitchell alerted Officer Lozano that "a Togetic just popped up," noting it was "[o]n Crenshaw, just South

---

As players move within their real world surroundings, their in-game "avatars" move within the game's map. Upon encountering a Pokémon, the player's mobile device "display[s] an image of [the] Pokémon as though it were in the real world," and the "player may throw a Poké Ball at it by flicking [the ball] from the bottom of the screen up toward the Pokémon." If the Pokémon "is successfully caught, it will come under the ownership of the player," and the player "is awarded two types of in-game currencies: Candies and Stardust," which are needed to "raise a Pokémon's 'Combat Power'" or "to evolve a Pokémon." The game's "ultimate goal" is to "complete the entries in the Pokédex, a comprehensive Pokémon logbook, by catching and evolving [Pokémon] to collect every one in it."

[3]     According to evidence admitted at the board of rights hearing, "Snorlax" is a Pokémon creature known as "the Sleeping Pokémon."

8

of 50th."[4]  After Mitchell apparently caught the Snorlax—exclaiming, "Got 'em"—petitioners agreed to "[g]o get the Togetic" and drove off.  When their car stopped again, the DICVS recorded Mitchell saying, "Don't run away.  Don't run away," while Lozano described how he "buried it and ultra-balled" the Togetic before announcing, "Got him."  Mitchell advised he was "[s]till trying to catch it," adding, "Holy crap, man.  This thing is fighting the crap out of me."  Eventually Mitchell exclaimed, "Holy Crap.  Finally," apparently in reference to capturing the Togetic, and he remarked, "The[ ] guys are going to be so jealous."  Petitioners then agreed to return to the 7-Eleven (where Sergeant Gomez later met them) to end their watch.  On the way, Mitchell remarked, "I got you a new Pokémon today, dude."

Detective McClanahan conducted a second round of interviews with petitioners to discuss her concern that they were playing a video game while on duty.  Petitioners denied playing a video game.  They claimed they were merely "having a conversation about Pokémon Go" and Officer Mitchell had been receiving text messages and alerts from a Pokémon Go players group where "people [were] bragging about their scores."  Detective McClanahan determined petitioners were not being truthful.

**4.**     ***The Board of Rights Hearing and Discharge Orders***

The Department charged petitioners with multiple counts of on-duty misconduct, including:  (1) Failing to respond to a robbery-in-progress call; (2) Making misleading statements

---

[4]     According to evidence admitted at the board of rights hearing, "Togetic" is a Pokémon creature known as a "happy, cheerful and a ditsy" Pokémon.

9

to Sergeant Gomez when asked why they did not hear the radio; (3) Failing to respond over the radio when their unit was called; (4) Failing to handle an assigned radio call; (5) Playing Pokémon Go while on patrol in their police vehicle; and (6) Making false statements to Detective McClanahan during a complaint investigation. Petitioners pled "guilty" to the first and third counts and "not guilty" to the remaining counts.

After opening statements, petitioners' representative objected to the admission of everything captured on the DICVS recording up to petitioners' conversation with Sergeant Gomez at the 7-Eleven that evening. She argued the conversations between petitioners preceding the meeting with Sergeant Gomez were "private," as petitioners did not realize the DICVS was running at the time, and she asserted the Board of Police Commissioner's Special Order No. 45 precluded the use of the DICVS to "monitor private conversations between Department employees." The Department stipulated to the admission of Special Order No. 45, but argued it did not apply because the DICVS had captured petitioners engaged in police business—not private affairs. The board ruled the DICVS recording could be offered as evidence subject to petitioners' continuing objection "to testimony about private conversations on the video."

The board of rights received testimony from Captain Davenport, Sergeant Gomez, Detective McClanahan, and Officers Lozano and Mitchell. Both petitioners characterized their willful failure to respond to the robbery in progress and to provide assistance to Captain Davenport as an "error" or "lack" in judgment. But they continued to insist they did not respond to the call because they believed they needed to remain within the boundaries of their "assigned . . . foot beat area." Both also

10

denied that they had made misleading statements to Sergeant Gomez, describing their comments about noise in the park as "generaliz[ed]" observations that were not meant as a specific response to the Sergeant's questions about why they had not heard the radio.

Petitioners also denied playing Pokémon Go while on duty. They claimed they were monitoring a "Pokémon tracker" application on their phone, but not playing the game itself. As for "catching" Pokémon, Officer Lozano insisted this referred to "capturing [an] image" of the Pokémon on the tracking application to share with friends, while Officer Mitchell said his statements about "fighting" the Togetic referred to "relaying that information to the groups on my app," adding that, "in order to take the picture, occasionally, the creature will fight." Lozano said they were not engaged in a game; rather, it was a "social media event." Mitchell said he did not consider the application a game because it was not "advertised as a game." Petitioners admitted leaving their foot beat area in search of Snorlax, but they insisted they did so "both" as part of an "extra patrol" and to "chase this mythical creature."

After the presentation of evidence, petitioners' representative moved to strike the count alleging petitioners made misleading statements to Sergeant Gomez. She argued their meeting violated petitioners' rights under POBRA, because the Sergeant interrogated them on matters that could lead to punitive action without affording them the opportunity to have a representative present.

The board of rights denied the motion and overruled petitioners' objection to the DICVS recording. Regarding POBRA, the board found the meeting with Sergeant Gomez

11

"was in the normal course of Sergeant Gomez'[s] duty" and his counseling and instruction "was routine and expected of a supervisor." As for the DICVS recording, the board received evidence that, subsequent to Special Order No. 45, the Professional Standards Bureau published Notice 13.5, which authorized the use of unintentionally recorded personal communications in disciplinary matters if there was "evidence of criminal or egregious misconduct." Consistent with the notice, the board determined the DICVS recording could be used as evidence in the disciplinary proceeding because the misconduct captured "would certainly be classified as egregious."

The board of rights reached a unanimous verdict, finding petitioners guilty on all but the count alleging they failed to handle an assigned radio call. Regarding the penalty, the board found petitioners "were disingenuous and deceitful in their remarks throughout the board [hearing]"; their willful failure to respond to the robbery in progress and attempt to conceal their whereabouts "demonstrated a severe negative attitude and disdain towards Captain Davenport, and reflected poorly" on the Department; their inattention to duty while playing a mobile phone game "violated the trust of the public, and represent[ed] unprofessional and embarrassing behavior"; and petitioners' "overall behavior [was] inconsistent with the values and principles expected of our police officers who serve this community." The board unanimously recommended petitioners be removed from employment with the Department.

The Chief of Police adopted the board's penalty recommendations and issued orders discharging petitioners from their positions as LAPD officers.

12

**5.** *The Administrative Mandamus Proceedings*

Petitioners challenged their discharge orders by a petition for administrative mandamus. They argued the board of rights did not proceed in the manner required by law when it allowed the DICVS recording to be used as evidence, and they maintained their procedural rights under POBRA were violated because Sergeant Gomez questioned them without affording them the opportunity to have a legal representative present. Petitioners also asserted discharge was "too harsh" a penalty under the circumstances.

In their reply to the City's opposition, petitioners argued—for the first time—the DICVS recording was inadmissible under Penal Code section 632, subdivision (d). The City objected to the argument on the grounds that petitioners had not cited the Penal Code section in their opening brief and the statute was not part of the administrative record.

The trial court denied the petition. Regarding Penal Code section 632, the court sustained the City's objection, concluding petitioners forfeited the argument by "improperly" raising it for the first time in reply. The court also found the board of rights properly admitted the DICVS recording into evidence under Notice 13.5. And the court concluded there had been no POBRA violation, because Sergeant Gomez questioned petitioners in the " 'normal course' " of his duty as a supervisor to counsel and instruct them. The court rejected the argument that the City abused its discretion by discharging petitioners from employment with the Department.

The trial court entered judgment denying the petition. Petitioners filed a timely notice of appeal.

13

**DISCUSSION**

1.   *Standard of Review*

Administrative mandamus is available to obtain judicial review of a public agency "decision made as the result of a proceeding in which by law a hearing is required to be given, evidence is required to be taken, and discretion in the determination of facts is vested in the inferior tribunal, corporation, board, or officer." (Code Civ. Proc., § 1094.5, subd. (a).)  In a proceeding for administrative mandate, the judicial inquiry extends to whether the public agency "has proceeded without, or in excess of, jurisdiction; whether there was a fair trial; and whether there was any prejudicial abuse of discretion." (*Id*., § 1094.5, subd. (b).)  An abuse of discretion is established if the public agency "has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence." (*Ibid*.)

Where the public agency's decision affects a fundamental vested right—such as a tenured police officer's employment— the trial court examines the administrative record for errors of law and exercises its independent judgment in assessing whether the evidence is sufficient to support the agency's findings. (*Bixby v. Pierno* (1971) 4 Cal.3d 130, 143; *Molina, supra,* 200 Cal.App.4th at pp. 60–61.)  In such cases, the court conducts a limited trial de novo and "abuse of discretion is established if the court determines that the findings are not supported by the weight of the evidence." (Code Civ. Proc., § 1094.5, subd. (c); *Mann v. Department of Motor Vehicles* (1999) 76 Cal.App.4th 312, 320.)  "In all other cases, abuse of discretion is established if the court determines that the findings are not supported by

14

substantial evidence in the light of the whole record." (Code Civ. Proc., § 1094.5, subd. (c).)

The trial court's factual findings are subject to our substantial evidence standard of review. (*Molina, supra,* 200 Cal.App.4th at p. 61.) We must uphold the court's findings unless they are so lacking in evidentiary support as to render them unreasonable. (*Ibid.*) We do not reweigh the evidence, but instead are bound to consider the facts in the light most favorable to the respondent, giving it every reasonable inference and resolving all conflicts in its favor. (*Ibid.*)

On questions of law, including the interpretation of statutes, city charters, and administrative regulations, we apply our de novo standard of review. (*Molina, supra,* 200 Cal.App.4th at p. 61; *Don't Cell Our Parks v. City of San Diego* (2018) 21 Cal.App.5th 338, 350 (*Parks*).)

**2.** ***The City Properly Used the DICVS Recording in Petitioners' Disciplinary Proceeding***

Petitioners contend the City did not proceed in the manner required by law when it used the portions of the DICVS recording that captured their purported " 'private conversations' " in the disciplinary proceeding against them. First, they argue use of the recording violated Special Order No. 45, and they maintain the City was compelled to follow that order under the Los Angeles City Charter (Charter), notwithstanding a supposedly conflicting authorization in Notice 13.5. Second, they argue Penal Code section 632 precluded admission of their "confidential communication[s]" at the board of rights hearing. Finally, assuming Notice 13.5 governs, petitioners insist there was no independent evidence of "egregious misconduct" to permit the initiation of a disciplinary investigation involving

15

the recording. None of these contentions advances a reasonable interpretation of the relevant statutes, Charter sections, or administrative regulations.

a. *The City Charter and Special Order No. 45*

A city charter is "the supreme law of the City, subject only to conflicting provisions in the federal and state Constitutions and to preemptive state law." (*Domar Electric, Inc. v. City of Los Angeles* (1994) 9 Cal.4th 161, 170 (*Domar*); *Parks, supra,* 21 Cal.App.5th at p. 349.) A "charter city may not act in conflict with its charter" and "[a]ny act that is violative of or not in compliance with the charter is void." (*Domar,* at p. 171.)

"The principles of construction that apply to statutes also apply to the interpretation of charter provisions." (*Parks, supra,* 21 Cal.App.5th at p. 349.) "We look first to the language of the charter, giving effect to its plain meaning. [Citation.] Where the words of the charter are clear, we may not add to or alter them to accomplish a purpose that does not appear on the face of the charter." (*Domar, supra,* 9 Cal.4th at p. 172.) While we apply our independent judgment in construing a city charter, "[a]dministrative interpretations [of city charter provisions] of longstanding are entitled to great weight unless they are plainly wrong." (*Baird v. City of Los Angeles* (1975) 54 Cal.App.3d 120, 123; *United Assn. of Journeymen v. City and County of San Francisco* (1995) 32 Cal.App.4th 751, 759, fn. 6; see also *Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 8; *Parks,* at pp. 349–350.)

Charter section 574, subdivision (c) authorizes the Chief of Police to "appoint, discharge, discipline, transfer and *issue instructions* to the employees of the department," other than certain enumerated department employees not implicated in

16

this case.  (Italics added.)  Additionally, Charter section 574, subdivision (g) authorizes the Chief of Police to "exercise further powers in the administration of the department conferred upon the Chief of Police by the Board of Police Commissioners." Consistent with that provision, Charter section 571, subdivision (b)(1) grants the Board of Police Commissioners authority to "issue instructions to the Chief of Police concerning the exercise of the authority conferred on the Chief of Police by the Charter, other than the disciplinary authority conferred by Section 1070."[5]

Petitioners maintain Special Order No. 45 precluded the City from taking disciplinary action based on the portions of the DICVS recording that captured their private conversations. They rely on a single line in the special order, appearing at the end of a paragraph introducing the procedures for using the DICVS as part of the pilot program approved by the Board of Police Commissioners.  The line reads:  "The Digital In-Car Video System is being deployed in order to provide Department employees with a tool for crime documentation and prosecution, and <u>not</u> to monitor private conversations between Department employees."

Six years after the Board of Police Commissioners approved Special Order No. 45, the Professional Standards Bureau published Notice 13.5 to provide commanding officers with "guidelines" for "determining appropriate and reasonable

---

[5]    Charter section 1070 establishes the scope of the authority of the Chief of Police to discipline a peace officer "[a]fter following predisciplinary procedures otherwise required by law."  Thus, by its express terms, Charter section 1070 does not apply to predisciplinary matters, such as the use of DICVS recordings in disciplinary proceedings.

17

responses to possible misconduct and other deviations from established procedures discovered during the review of [ ]DICV[S] recordings."[6]  With respect to "Unintentionally Recorded Personal Communications" (boldface omitted), Notice 13.5 reaffirms, consistent with Special Order No. 45, that "the DICV[S] system was not deployed 'to monitor private conversations between Department employees.' "  However, Notice 13.5 adds, if "a sensitive personal communication between employees is recorded, the personal communication will not be used to initiate a personnel complaint investigation or used against an employee in the adjudication of a personnel complaint, or during any subsequent hearings, *unless there is evidence of criminal or egregious misconduct.*"  (Italics added.)

The trial court concluded the board of rights properly admitted the DICVS recording under Notice 13.5.  Petitioners contend this was error.  Because the Board of Police Commissioners approved the DICVS pilot program with the express understanding, as stated in Special Order No. 45, that it be used "for crime documentation and prosecution, and <u>not</u> to monitor private conversations between Department employees," petitioners argue Charter section 571, subdivision (b)(1)

---

[6]     The Professional Standards Bureau oversees the forces investigations, special operations, and internal affairs divisions, which comprise the investigative arm of the Chief of Police with respect to employee misconduct that either violates the law or Department policies, procedures, or practices.  (*Quezada v. City of Los Angeles* (2014) 222 Cal.App.4th 993, 998, fn. 3.)  The Commanding Officer of the Professional Standards Bureau and the Chief of Staff of the Office of the Chief of Police approved Notice 13.5.

18

precluded the Chief of Police from approving Notice 13.5. Their implicit premise is that Notice 13.5 conflicts with Special Order No. 45 and, therefore, the Chief of Police exceeded the authority granted to him under Charter section 571, subdivision (b)(1) by implementing the guidelines set forth in the notice. That premise is flawed.

As the trial court correctly reasoned, Notice 13.5 does not run afoul of Charter section 571, subdivision (b)(1), because Special Order No. 45 does not provide instructions or mandates to the Chief of Police when, through *unintentional* conduct, the DICVS records a private communication. Following its introductory paragraphs, Special Order No. 45 sets forth the procedures officers are to follow in using the DICVS for "*law enforcement activities*" (italics added, boldface and capitalization omitted), including when the DICVS must be activated and when it may be deactivated for traffic stops, pursuits, suspect transports, and pedestrian stops. The order provides officers with instructions for reviewing and documenting material recorded with the DICVS, and instructions for reviewing the recordings in advance of a use of force interview. Finally, Special Order No. 45 specifies that "[a]ll data and imagery captured by the DICVS are the sole property of the Los Angeles Police Department" and warns employees that misuse of DICVS recordings "may result in disciplinary action." Thus, Special Order No. 45 contemplates and exclusively concerns the *intentional* use of the DICVS for law enforcement activities. Because the Board of Police Commissioners did not give instructions on the use of *unintentionally* recorded conversations in disciplinary proceedings, Special Order No. 45 does not restrict

"the exercise of the authority conferred on the Chief of Police by the Charter" under Charter section 571, subdivision (b)(1).

More to the point, the guidelines set forth in Notice 13.5 are consistent with the general purpose of the DICVS embodied in Special Order No. 45. Notice 13.5 reaffirms that the DICVS was not deployed to monitor private conversations, but it recognizes there may be instances when the system records personal communications that evidence "criminal or egregious misconduct" by Department personnel. Because the DICVS's purpose, as stated in Special Order No. 45, is to "provide Department employees with a tool for crime documentation and prosecution," it would be preposterous to require commanding officers and internal affairs investigators to ignore evidence of "criminal or egregious misconduct" simply because it was unintentionally captured on a DICVS recording. Charter section 574, subdivision (g) authorizes the Chief of Police to "exercise further powers in the administration of the department conferred upon the Chief of Police by the Board of Police Commissioners." Because the guidelines set forth in Notice 13.5 are consistent with Special Order No. 45, the Chief of Police and Professional Standards Bureau acted well within their authority in issuing the guidance.

b. *Penal Code section 632*

Penal Code section 632 "prohibits the *intentional* eavesdropping to a confidential communication by means of any electronic amplifying or recording device, without the consent of all parties."[7] (*Marich v. MGM/UA Telecommunications, Inc.*

---

[7] Penal Code section 632, subdivision (a) provides: "A person who, intentionally and without the consent of all parties to a confidential communication, uses an electronic amplifying or

20

(2003) 113 Cal.App.4th 415, 421 (*Marich*).)  Under Penal Code section 632, subdivision (d), "evidence obtained as a result of eavesdropping upon or recording a confidential communication in violation of this section is not admissible in any judicial, administrative, legislative, or other proceeding," except "as proof in an action or prosecution for violation of this section." Petitioners contend the statute precluded admission of the DICVS recording in the board of rights hearing.  We disagree.

The text of Penal Code section 632 plainly requires proof of "*intentional* conduct" to establish a statutory violation and to invoke the evidentiary sanction set forth in subdivision (d). (*Marich, supra,* 113 Cal.App.4th at p. 421.)  Under the statute, "the recording of a confidential conversation is intentional if the person using the recording equipment does so with the purpose or desire of recording a confidential conversation, or with the knowledge to a substantial certainty that his use of the equipment will result in the recordation of a confidential

---

recording device to eavesdrop upon or record the confidential communication, whether the communication is carried on among the parties in the presence of one another or by means of a telegraph, telephone, or other device, except a radio, shall be punished by a fine not exceeding two thousand five hundred dollars ($2,500) per violation, or imprisonment in a county jail not exceeding one year, or in the state prison, or by both that fine and imprisonment.  If the person has previously been convicted of a violation of this section or Section 631, 632.5, 632.6, 632.7, or 636, the person shall be punished by a fine not exceeding ten thousand dollars ($10,000) per violation, by imprisonment in a county jail not exceeding one year, or in the state prison, or by both that fine and imprisonment."

conversation." (*People v. Superior Court of Los Angeles County* (1969) 70 Cal.2d 123, 134 (*Smith*); *Marich,* at p. 421.)

Consistent with the statute's intentional conduct requirement, Notice 13.5, by its terms, authorizes the use of only "*Unintentionally* Recorded Personal Communications" in disciplinary proceedings. (Italics added, boldface omitted.) Notwithstanding this evident consistency, petitioners argue Notice 13.5 actually proves just the opposite—that the City (acting through the Department and Chief of Police) *intentionally* uses the DICVS to record the confidential communications of Department personnel. In petitioners' telling, Notice 13.5 shows the City was "aware that equipping police cars with recording devices could record 'sensitive personal communications between employees,' " and this, petitioners contend, "establishes intent within the meaning of [*Smith* and *Marich*]." We are not persuaded.

Almost a decade after *Smith*, our Supreme Court revisited the definition of " 'intentionally,' " summarizing its holding in *Smith* as follows: "This court held that 'intentionally' in [the invasion of privacy] statute required an intent to bring about the proscribed result rather than an intent merely to do an act which unintentionally brought about that result. Thus, the [*Smith*] court concluded that the Penal Code section required an intent *to record a confidential communication*, rather than simply an intent to turn on a recording apparatus which *happened to record a confidential communication*." (*Estate of Kramme* (1978) 20 Cal.3d 567, 572, fn. 5, second italics added.)

To the extent Notice 13.5 says anything about the City's intent with respect to recording confidential communications, the notice squarely situates the City's intent in the latter

22

category described in *Estate of Kramme*.  In recognizing there could be "*Unintentionally* Recorded Personal Communications" (italics added, boldface omitted), Notice 13.5 proves only that the City understood it was deploying recording devices that *might* happen to record a confidential communication—not that the City intended to record those communications.  Moreover, the procedures outlined in Special Order No. 45 suggest that only the officers *in the vehicle* can activate the DICVS.  Although petitioners testified they were unaware the DICVS was running on the day in question, they presented no evidence to establish who activated the system.  Without that critical piece of evidence, petitioners plainly could not prove "[a] person . . . , *intentionally* and without the consent of all parties to a confidential communication," used the DICVS to record their purportedly confidential communications that day.  (Pen. Code, § 632, subd. (a).)

Because there was no evidence that a person intentionally recorded a confidential communication in violation of the statute, petitioners cannot show the trial court prejudicially erred by rejecting their Penal Code section 632 argument.

c. *Notice 13.5*

Finally, petitioners contend Notice 13.5 did not authorize the Department's use of the DICVS recording in their disciplinary proceedings because there was no independent evidence, apart from the recording itself, of egregious misconduct.  Because Notice 13.5 states a "personal communication will not be used *to initiate* a personnel complaint investigation . . . unless there is evidence of criminal or egregious misconduct" (italics added), petitioners argue Sergeant Gomez was not authorized to review the DICVS recording unless he had some other evidence

23

of egregious misconduct to initiate the review. The argument misconstrues Notice 13.5.

Contrary to petitioners' construction, Notice 13.5 does not impose an evidentiary threshold on a commanding officer's authority to review a DICVS recording. Rather, the notice means exactly what it says—that "a personal communication will not be used to initiate *a personnel complaint investigation* . . . unless there is evidence of criminal or egregious misconduct." (Italics added.) Nothing in Notice 13.5 suggests there must be *independent* evidence of criminal or egregious misconduct before the DICVS recording *may be reviewed.* Indeed, because the Professional Standards Bureau published the notice to provide "guidelines" for "determining appropriate and reasonable responses to possible misconduct . . . *discovered during the review of [ ]DICV[S] recordings*" (italics added), the only reasonable reading of the text is that it authorizes the initiation of disciplinary proceedings when the DICVS recording *itself* discloses evidence of criminal or egregious misconduct. Thus, while Notice 13.5 ensures that Department personnel will not be subject to discipline for minor infractions or purely private communications unrelated to their police work (as long as the private communications do not evidence criminal misconduct), the notice reasonably provides that commanding officers will not be forced to ignore egregious misconduct that is unintentionally captured on a DICVS recording.

Petitioners do not dispute that the DICVS recording constituted evidence of egregious misconduct. And the record plainly shows Sergeant Gomez initiated a misconduct complaint investigation based on this evidence.

24

We conclude the City proceeded in the manner required by law with respect to the DICVS recording.

3. ***Sergeant Gomez's Questioning Did Not Violate Petitioners' Rights Under POBRA***

POBRA "provides a catalog of basic rights and protections that must be afforded all peace officers by the public entities which employ them." (*California Correctional Peace Officers Assn. v. State of California* (2000) 82 Cal.App.4th 294, 304.) The Act's purpose is "to maintain stable employer-employee relations and thereby assure effective law enforcement." (*Lybarger v. City of Los Angeles* (1985) 40 Cal.3d 822, 826.) "Although notions of fundamental fairness for police officers underlie the Act, a number of its provisions also reflect the Legislature's recognition of the necessity for internal affairs investigations to maintain the efficiency and integrity of the police force serving the community." (*Pasadena Police Officers Assn. v. City of Pasadena* (1990) 51 Cal.3d 564, 572.) POBRA thus reflects the Legislature's balancing of two competing interests: "the public interest in maintaining the efficiency and integrity of its police force, which, in enforcing the law, is entrusted with the protection of the community it serves"; and the peace officer's "personal interest in receiving fair treatment" during an investigation that may subject the officer to punitive action. (*Pasadena Police*, at p. 569; *White v. County of Sacramento* (1982) 31 Cal.3d 676, 681.)

Like POBRA generally, section 3303, subdivision (i) balances an officer's interest in a fair disciplinary process with the public's interest in maintaining an efficient police force. The statute protects the officer's interest by affording an officer the right to have a representative of his or her choosing present

25

"whenever an interrogation focuses on matters that are likely to result in punitive action against" the officer.[8]  (§ 3303, subd. (i).) But, critically, the statute also ensures that this protection does not generate needless inefficiency by expressly specifying that the right to representation does "not apply to any interrogation of a public safety officer in the normal course of duty, counseling, instruction, or informal verbal admonishment by, or other routine or unplanned contact with, a supervisor or any other public safety officer."  (§ 3303, subd. (i).)  This provision "was included to avoid claims that almost any communication is elevated to an 'investigation' " by expressly "exclud[ing] routine communication within the normal course of administering the department," as well as "innocent preliminary or casual questions and remarks between a supervisor and officer."  (*City of Los Angeles v. Superior Court* (1997) 57 Cal.App.4th 1506, 1514 (*Labio*).)

Petitioners contend the right to representation under section 3303, subdivision (i) attached to their meeting with Sergeant Gomez because the Sergeant arranged the meeting with the express purpose "to find out why they had not responded to a 'high priority call' that had the potential to create a dangerous situation for Captain Davenport."  The trial court rejected this argument, finding the "meeting did not violate POBRA" because it " 'was in the normal course of Sergeant Gomez'[s] duty [to provide] counseling [and] instruction and was routine and expected of a supervisor.' "

---

[8]    The Act defines "punitive action" as "any action that may lead to dismissal, demotion, suspension, reduction in salary, written reprimand, or transfer for purposes of punishment." (§ 3303.)

We review the trial court's factual finding regarding the nature of the meeting for substantial evidence. (*Steinert, supra,* 146 Cal.App.4th at p. 462; *Shafer v. Los Angeles County Sheriff's Dept.* (2003) 106 Cal.App.4th 1388, 1396.) We are thus "required to resolve all evidentiary conflicts, draw all reasonable factual inferences, and uphold all express or implied findings in [the Department's] favor, if supported by substantial evidence." (*Jaramillo, supra,* 200 Cal.App.4th at p. 815.)

Substantial evidence supports the trial court's finding. As the court explained in its written decision, the evidence showed the events surrounding the robbery call "unfolded rapidly," and Sergeant Gomez characterized the minutes that followed Captain Davenport's radio call as " 'chaotic.' " While the Sergeant found it "peculiar" that petitioners had initiated their Code 6 at approximately the same time Captain Davenport responded to the robbery, the frenzied pace of the incident and the hectic radio chatter surrounding it also gave him reason to believe petitioners had not responded because they were occupied with other business and did not hear his attempt to contact them on the radio.

When Sergeant Gomez met with petitioners later that evening, he first asked them to clarify their duties, recognizing, as the trial court observed, there "could be any number of reasons, consistent with [their] duties as foot beat officers, that [petitioners] would be Code 6 on Crenshaw Corridor at the time of the robbery call." Officer Lozano explained they were charged with making community contacts with citizens and businesspeople in the area, and their main focus was the Leimert Park area of the Crenshaw Corridor. Sergeant Gomez then asked petitioners if "their radios were working" and if they had heard

27

what he believed was a call for "backup at Crenshaw Mall" for a robbery in progress. Petitioners explained the area around the park was often very loud, especially on Saturdays when parkgoers played music or used the public announcement system. Sergeant Gomez acknowledged this was a credible explanation for why they had not heard the radio, remarking in his testimony about the meeting: "I couldn't dispute that. If there's loud noise and you can't hear the radio, I have nothing to say." The Sergeant instructed petitioners that they should have moved to a location where they could hear the radio, advised them that he "was counseling them for not listening to the radio," and "left it at that."

Consistent with Sergeant Gomez's characterization of the meeting, Officer Mitchell acknowledged the meeting constituted "a normal exchange between supervisor and subordinate" and it was "the same type of discussion or . . . supervisory oversight that's provided daily to the patrol units." This admission, coupled with Sergeant Gomez's testimony, and other reasonable inferences that can be drawn from the Sergeant's perception of the events that day support the trial court's finding that Sergeant Gomez met with petitioners as part of his normal duty to provide "counseling, instruction, or informal verbal admonishment" to subordinate public safety officers. (§ 3303, subd. (i).) Independently applying the law to the trial court's factual findings, we conclude POBRA did not apply. (See *Steinert, supra,* 146 Cal.App.4th at pp. 463–465 [where commanding officer "knew no facts that would have caused him to believe" petitioner engaged in serious misconduct, apparent minor infraction that "could have been properly addressed by a training/educational

28

meeting" did not implicate right to representation under § 3303, subd. (i)].)

Petitioners maintain *Labio, supra,* 57 Cal.App.4th 1506 is directly on point.  We disagree.[9]  Officer Labio was on duty as an airport police officer when a fatal accident occurred near the airport.  (*Id.* at pp. 1509–1510.)  Shortly after the accident, Labio's commanding officer learned that a male Filipino officer drove past the accident scene in a marked police vehicle and, without stopping to render aid, went to a donut shop.  (*Id.* at p. 1510.)  The commander checked the deployment log and confirmed Labio was the only officer matching the description, and he spoke with the donut shop's owner, who confirmed a male Filipino officer had been there at about the time of the accident.  (*Ibid.*)  The commander also discovered Labio did not have permission to use a vehicle that evening and asked another officer "to write a report documenting that fact."  (*Ibid.*)

Before questioning Officer Labio, the commander "knew that passing by the scene of the accident without stopping to render aid was a serious offense and that the officer could face

---

9       The other case petitioners cite—*Hanna v. City of Los Angeles* (1989) 212 Cal.App.3d 363—is totally irrelevant. In a nonpublished opinion preceding *Hanna,* the appellate court had determined an interrogation violated an officer's rights under POBRA and remanded the case to the trial court " 'for the limited purpose of determining whether the violations of the Act warrant the suppression of evidence.' "  (*Id.* at p. 369.)  In view of this procedural posture, the *Hanna* opinion naturally addresses only the suppression issue and says nothing about when an officer is entitled to representation under section 3303, subdivision (i). (See *Hanna*, at pp. 371–375.)  The trial court understandably declined to address *Hanna* in its ruling denying the petition.

disciplinary action if the allegation were sustained." (*Labio, supra,* 57 Cal.App.4th at p. 1510.) He also "realized the matter would have to be forwarded to the department's internal affairs division." (*Id.* at p. 1511.) Nevertheless, the commander summoned Labio to his office and, upon Labio's arrival, immediately began questioning him about his whereabouts and use of a police vehicle during the shift, without informing Labio that he was under investigation or informing him of his rights under POBRA. (*Ibid.*)

The trial court concluded the questioning violated Labio's rights under POBRA and the appellate court agreed, concluding "the questioning [could] only be characterized as part of an investigation of Officer Labio for sanctionable conduct." (*Labio, supra,* 57 Cal.App.4th at p. 1514.) Because the trial court had found a violation, the *Labio* court gave short shrift to the city's contention that the questioning constituted a routine or unplanned contact within the normal course of duty, stating only: "There probably are cases in which routine questions and remarks begin to shade into an investigation to which subdivision (i) does not apply. We need not decide just where that point is reached because it is clear that under our test an investigation was underway in this case." (*Ibid.*)

In contrast to *Labio*, here, Sergeant Gomez did not have evidence that petitioners had committed a crime or egregious misconduct when he met with them to discuss the radio calls earlier that evening. To be sure, the record shows Sergeant Gomez was uneasy about the timing of petitioners' Code 6, both before and after their meeting; however, because he had not had "much contact" or "other issues" with them, he testified the informal admonishment and counseling normally would have

30

been the "end" of it. It was only the next morning that it dawned on him to look at their vehicle's DICVS recording to "find out what [petitioners] do on their average day." At the time, of course, the Sergeant had no reason to know the DICVS had recorded petitioners' conversation regarding Captain Davenport or the mall robbery, as, under Special Order No. 45, petitioners had been instructed to activate the DICVS "during the initiation" of activities such as vehicle stops, pursuits, suspect transports, or pedestrian stops, and to deactivate the unit after the "incident or field contact has stabilized or the contact has ended." Nevertheless, by happenstance the DICVS did capture petitioners' conversations, and the record shows it was uncovering *this evidence* of egregious misconduct—*after* his meeting with petitioners—that led Sergeant Gomez to initiate formal disciplinary action against them. Even if some of the Sergeant's "questions and remarks beg[an] to shade into an investigation" during the meeting (*Labio, supra,* 57 Cal.App.4th at p. 1514), the record amply supports the trial court's finding that this was, as Officer Mitchell acknowledged, a routine exchange between supervisor and subordinate within the normal course of administering the department. POBRA did not apply. (See *Steinert, supra,* 146 Cal.App.4th at p. 466 [evidence that commanding officer "had no intention to punish [petitioner]," and only sought "to make sure she knew the proper procedure for future" action, supported trial court's refusal to suppress evidence of petitioner's apparent lie during questioning].)

## DISPOSITION

The judgment is affirmed.  The City and the Chief of Police are entitled to costs, if any.

**CERTIFIED FOR PUBLICATION**

EGERTON, J.

We concur:

EDMON, P. J.

WINDHAM, J.[*]

---

[*]    Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.